**TRISON INVESTMENT COMPANY, Appellant,**

v.

**Emilynn B. WOODARD, Appellee.**

**No. 05–92–00003–CV.**

Court of Appeals of Texas, Dallas.

Aug. 31, 1992.

Rehearing Denied Oct. 9, 1992.

Doug K. Butler and Julie H. Roberson, Dallas, for appellant.

Molly W. Bartholow and Troy C. Vinson, Dallas, for appellee.

Before ENOCH, C.J., KAPLAN, J., and T.C. CHADICK[1], J. Retired (Sitting by Assignment).

1. The Honorable T.C. Chadick, Justice, Supreme Court of Texas, Retired, sitting by assignment.

## OPINION

ENOCH, Chief Justice.

Trison Investment Company (Trison) appeals the trial court's judgment granting an implied vendor's lien under a divorce agreement, and awarding interest, attorneys' fees, and costs to Emilynn Woodard. We sustain Trison's first point of error, reverse the judgment of the trial court, and render judgment in Trison's favor.

## FACTS

During their marriage, Max and Emilynn Woodard purchased 631.14 acres of real property located in Anderson County, Texas, known as the "Windfall Farm" (the Farm). On February 26, 1985, the Woodards executed a decree of divorce in which Max received the Farm and other real and personal property. To equalize the values in the division of the community estate, Max agreed to pay Emilynn $1,500,000— $1,000,000 was to be paid in quarterly installments of $50,000 each beginning April 30, 1985, and $500,000 was to be paid on February 26, 1986 or when the Farm was sold, whichever occurred first. About five months after the divorce, Max borrowed $2,000,000 from MBank Dallas, N.A. (MBank) securing the note with a deed of trust on the Farm. On February 25, 1987, Max filed for protection under federal bankruptcy laws after defaulting on his payments to Emilynn. Emilynn filed a proof of claim in Max's bankruptcy proceeding alleging that she had an implied vendor's lien on the Farm. On February 1, 1988, the bankruptcy court granted relief from the stay, allowing Emilynn to pursue her claim in state court.

In February, 1988, MBank foreclosed its lien on the Farm after Max defaulted on the $2,000,000 promissory note. MBank subsequently sold the Farm to Jeffrey and Nancy Marcus. On May 3, 1988, the Marcuses conveyed the Farm to Trison.

The trial court's order of December 6, 1990, granted Emilynn's motion for partial summary judgment embracing her entire claim against Trison with the exception of

attorneys' fees, interest, and costs, and denied Trison's motion for summary judgment. Emilynn subsequently filed motions for partial summary judgment on the issues of attorneys' fees and prejudgment interest. The court granted her motions and then entered final judgment on September 4, 1991. The total relief granted to Emilynn included an implied vendor's lien on an undivided one-half interest in the Farm, prejudgment interest, postjudgment interest, attorneys' fees, and costs.

## SUMMARY JUDGMENT STANDARD OF REVIEW

In its first point of error, Trison contends that the trial court erred in granting Emilynn's motion for summary judgment and denying Trison's motion for summary judgment because, as a matter of law, no implied vendor's lien arose from the divorce agreement.

We first set out the applicable standard of review as follows:

1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.
2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.
3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

*Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985).

■ Rule 166a of the Texas Rules of Civil Procedure provides a method of summarily ending a case that involves only a question of law and no genuine fact. TEX. R.CIV.P. 166a; *Spencer v. City of Dallas,* 819 S.W.2d 612, 615 (Tex.App.—Dallas 1991, no writ). The trial court's duty is to determine if there are any fact issues to try, not to weigh the evidence or determine its credibility and try the case on affidavits. *Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929, 931 (1952). The purpose of rule 166a is to eliminate patently unmeritorious claims or untenable defenses. The rule is not meant to deprive the litigants of

their right to a full hearing on the merits of any real issue of fact. *Spencer,* 819 S.W.2d at 615. To be entitled to summary judgment, defendants must either disprove an essential element of the plaintiff's cause of action as a matter of law or establish all the elements of its defense as a matter of law. *Id.*

## IMPLIED VENDOR'S LIEN

■ A vendor's lien is a lien for purchase money. *McGoodwin v. McGoodwin,* 671 S.W.2d 880, 881 (Tex.1984) (op. on reh'g). An implied vendor's lien exists to secure the payment of purchase money when no express lien is reserved in a contract or deed and the purchase money is not paid. *Id.* at 882. A lien arises by implication as "a natural equity" that creates a constructive trust so that a vendee cannot keep the estate of another without paying for it. *White, Smith & Baldwin v. Downs,* 40 Tex. 225, 231 (1874) (op. on reh'g).

■ When a contract provides for the payment of consideration partly for land and partly for personal property, an implied vendor's lien does not arise on the land unless it can be shown what part of the consideration was given for the land. *Sutton v. Sutton,* 39 Tex. 549, 552 (1873); *see generally* Annotation, *Vendor's or Vendee's Lien Against Realty in Case of Combined Sale of Realty and Personalty,* 88 A.L.R. 92, 93 (1934) (most jurisdictions hold that when realty and personalty are sold simultaneously for gross consideration and the consideration is not allocated between the realty and personalty, the implied vendor's lien is destroyed). When the consideration recited in a deed is for the conveyance of real estate and personal property and there is no apportionment of the consideration between the real and personal property, an implied vendor's lien cannot attach to the real estate in favor of the seller. *Goodwin v. Smith,* 84 S.W.2d 827, 829–30 (Tex.Civ.App.—Beaumont 1935, writ dism'd). A settlement agreement incorporated into a divorce decree is treated as a contract in Texas, and its

meaning is governed by the law of contracts. *McGoodwin*, 671 S.W.2d at 882.

■ The divorce agreement provides:

3.02. *Husband's Property.* Husband shall own, possess and enjoy, free from any claim of Wife, the property listed in Schedule 2, and Wife hereby partitions, quitclaims and assigns to Husband all that property, together with any insurance policies covering that property and any escrow accounts that relate to that property.

\* \* \* \* \* \*

8.01. *Cash Payment.* In order to equalize values and to effect the division of the community estate of the parties, Husband shall pay to wife the sum of One Million Five Hundred Thousand Dollars ($1,500,000) as follows:

(a) The sum of $50,000 per quarter commencing on April 31, 1985, and thereafter on July 31, October 31, and January 31 for nineteen (19) consecutive quarters until the aggregate sum of $1,000,000 has been paid to Wife by Husband.

(b) The sum of $500,000 paid to Wife by Husband on or before one (1) year from the date of divorce in this cause or upon the sale of Windfall Farm, whichever occurs first.

In schedule one of the divorce agreement, Emilynn received real and personal property as provided for in thirteen enumerated paragraphs. Max received personal and real property in twenty-five enumerated paragraphs in schedule two. On the date of their divorce, Emilynn conveyed the Farm by special warranty deed to Max in consideration of ten dollars "and in further consideration of the Agreement Incident to Divorce...." A promissory note was executed on January 21, 1986, to memorialize Max's obligation. It reads: "This Note has been executed and delivered in conditional satisfaction of the terms of Section 8.01(b)" of the divorce agreement.

Emilynn concedes that numerous items changed hands as a result of the divorce. Nonetheless, Emilynn urges that the $500,000 note specifically related to the Farm. She points out that at the time of their

divorce, the Farm was appraised at $1,000,000 and, therefore, her half interest in it would equal $500,000.

Trison responds that the $500,000 note represents an equalization factor not tied to any specific property. Trison notes that in an earlier draft of the divorce agreement, Emilynn would have received cash payments of $1,000,000 instead of $1,500,000.[2] The final draft of the divorce agreement reflects the latter sum because Max received more Lear Petroleum stock than previously agreed upon. Trison argues that "if the $500,000 is specifically attributable to anything, it is the reduction in the number of shares of the Lear Petroleum stock which Emilynn Woodard was to receive." The record also includes a deposition excerpt as part of Trison's summary judgment proof in which Emilynn testified that the cash payment of $1,500,000 was for community property, and not specially allocable to any particular asset. She also stated that she and Max intended to divide the community estate fifty-fifty.

Emilynn primarily relies on three cases, *McGoodwin, supra, Stapler v. Stapler,* 720 S.W.2d 271 (Tex.App.—Fort Worth 1986, no writ), and *Colquette v. Forbes,* 680 S.W.2d 536 (Tex.App.—Austin 1984, no writ), to support her argument that she is entitled to an implied vendor's lien.

In *McGoodwin,* the court found that an implied vendor's lien arose from a divorce agreement awarding the husband *a particular piece of real estate,* the husband's homestead, in consideration of payment to the wife of $22,500. *McGoodwin,* 671 S.W.2d at 881–82. Since the husband failed to pay the $22,500 as agreed, the wife was awarded a lien of an undivided one-half interest in the property. *Id.* at 882.

In *Stapler,* the divorce decree awarded the wife real property and obligated her to assume responsibility for certain debts, including a debt to the Internal Revenue Service. *Stapler,* 720 S.W.2d at 272. The court held that the husband retained an implied vendor's lien although the divorce decree did not specify that the payment of

_____

2. The earlier version of the divorce agreement completely omits section 8.01(b).

the debts was the consideration for the real estate. *Id.* The judgment obtained in a bench trial, where no findings of fact were filed, was supported by evidence that the husband would not sign the divorce agreement unless the wife assumed the debts and that "each gave things to the other in return for what they got under the decree." *Id.* The husband was allowed to foreclose on the implied vendor's lien so that the proceeds could be divided between the wife and the Internal Revenue Service. *Id.* at 271–72.

In *Forbes*, the wife received the husband's interest in their home in return for an unsecured note due five years after the divorce or immediately upon the wife's remarriage or cohabitation with an unrelated adult male. *Forbes*, 680 S.W.2d at 537. The husband sued the wife for the amount due under the note when she cohabitated with an adult male. *Id.* at 537–38. The court held that an implied vendor's lien arose because the note and divorce agreement provided that the " 'note is for the husband's ownership interest in [the house].' " *Id.* at 538.

*McGoodwin, Stapler*, and *Forbes* involve divorce agreements involving *a particular piece of property* for which a spouse agreed to pay consideration, but failed to do so. In each of these cases, specific consideration was attributable to specific real estate. Here, the consideration of $1,500,000 was attributed to an equalization of values and to effect the community estate division. In this division, Emilynn also received personal property including stock, furniture, jewelry, and a car. She also received a home in Highland Park, and interest in Garland property. Max received a house in Glenlakes, real property in Colorado, the Farm, and personal property including stock, furniture, livestock, horses, a car, motorcycle, and jewelry. Of the $1,500,000 due to Emilynn, $500,000 was to be paid a year after the divorce or upon sale of the Farm, whichever event occurred first. The $500,000 was not attributable to ownership of the Farm—whether the Farm was sold or not, the $500,000 debt remained due. The sale of the Farm merely provided a way to accelerate the due date of the $500,000 debt. "It is well settled that a mere promise to pay a debt out of a particular fund does not alone constitute an assignment of the fund." *White v. Cooper*, 415 S.W.2d 246, 248 (Tex.Civ.App.—Amarillo 1967, no writ).

In this case, no specific consideration is attributable to specific real estate. There is no apportionment of the consideration between real and personal property. The divorce agreement specifies that Max "shall own, possess and enjoy, *free from any claim of Wife*, the property listed in Schedule 2" including the Farm. We hold that an implied vendor's lien cannot attach to the Farm in favor of Emilynn as a matter of law. The trial court erred in granting Emilynn's motion for summary judgment asserting her entitlement to a vendor's lien. Further, the trial court erred in denying Trison's motion for summary judgment because Trison has satisfied its burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Accordingly, we sustain Trison's first point of error.

In view of our disposition of Trison's first point of error it is unnecessary to address the remaining points of error. The judgment of the trial court is reversed and judgment is rendered in favor of Trison.