The ESTATE OF Herndon SCOTT, Deceased, et al., Appellants,

v.

VICTORIA COUNTY, Texas, et al., Appellees.

No. 13–88–183–CV.

Court of Appeals of Texas,
Corpus Christi.

Sept. 28, 1989.

O.F. Jones, III, Victoria, for appellants.

R.D. Cullen, Kevin D. Cullen, James G. Stouffer, Jr., Victoria, for appellees.

Before BENAVIDES, UTTER and DORSEY, JJ.

## OPINION

BENAVIDES, Justice.

Appellants (the estate of Herndon Scott, S.B.T. Company Unit Two, J.W. Kirk, Inc., Kirkpatrick Construction Co., Inc., John W. Kirkpatrick, Jack Lee, Jr., The Jack Lee Co, Inc., Bill Smith, G & L Builders, Inc., and Art Leatherwood) appeal from a take-nothing judgment rendered in favor of the appellees (Victoria County, Texas, the County Commissioners of Victoria County, and Honorable Norman Jones, the county judge).[1] The record reveals that appellants, owners of undeveloped tracts of land, brought an inverse condemnation suit against the County. Appellants alleged that the County temporarily "took" their property without just compensation contrary to the rights guaranteed by TEX. CONST. art. 1, § 17 and U.S. CONST.

---

1. The appellees will hereinafter be referred as "the County."

amends. V and XIV, § 1 when it issued a sewer moratorium prohibiting additional sewer hookups in certain areas of Victoria County, Texas. Appellants also alleged that they were entitled to compensation pursuant to 42 U.S.C. § 1983 (1981) for the deprivation of their rights, privileges or immunities secured by the Constitution or laws of the United States.

The case was tried to a jury. During trial, the trial court excluded testimony concerning appellants' alleged 42 U.S.C. § 1983 cause of action; therefore, the case was tried solely on the "taking" cause of action. At the conclusion of the evidence, the trial court found that there had been a temporary taking as a matter of law and instructed a verdict in favor of appellants. The trial court then submitted a single issue to the jury concerning the damages suffered by appellants as a result of the taking. The jury found that appellants had suffered no damages and the trial court entered a take-nothing judgment against appellants.

From this judgment appellants assert this appeal presenting twelve points of error for review. The County asserts one cross-point by which it alleges that the trial court erred in finding that there was a temporary taking as a matter of law. Specifically, the County argues that the evidence presented at trial conclusively established that there was no taking. We agree. Accordingly, we affirm the judgment of the trial court on other grounds.

Since a review of the evidence is necessary to the determination of the County's cross-point, it is also necessary to address appellants' eighth point of error by which appellants contend that the trial court erred in allowing witness Mickey Garza to testify on behalf of the County since he had not been identified as a witness prior to trial in accordance with Tex.R.Civ.P. 166b.

The record reveals that in February of 1986, the County filed answers to interrogatories designating Sidney Hunt, an employee of the Texas Water Control Board, as an expert witness. The County also designated the unnamed "custodian of records" of the Texas Water Control Board. On November 23, 1987, approximately seventeen days prior to trial, the County supplemented its answers to interrogatories designating Mickey Garza, another employee of the Water Control Board, as a witness. In its supplemental answer to interrogatories, the County informed appellants that it had just been informed that Hunt was no longer employed by the Water Control Board and that Garza would testify in his place to essentially the same matters.

At trial, appellants objected to the introduction of Garza's testimony. A brief hearing was held outside the presence of the jury in which counsel for the County explained to the court the above situation. Counsel for the County told the court that Garza's testimony was essentially the same as Hunt's testimony, and that appellants had never attempted to depose Hunt. Likewise, counsel for the County told the court that Garza was the custodian of records for the Texas Water Control Board. After listening to the arguments of counsel, the trial court found "good cause" and allowed the witness to testify on behalf of the County. On appeal, appellants contend that the County failed to show that "good cause" existed to excuse its late supplementation. We disagree.

■ It is well established that the failure to supplement discovery at least thirty days before trial automatically results in the loss of the opportunity to offer the witness' testimony, *unless the trial court finds good cause sufficient to require its admission. Morrow v. H.E.B., Inc.,* 714 S.W.2d 297 (Tex.1986); *Yeldell v. Holiday Hills Retirement and Nursing Center, Inc.,* 701 S.W.2d 243 (Tex.1985); *Ramos v. Champlin Petroleum Co.,* 750 S.W.2d 873, 876 (Tex.App.—Corpus Christi 1988, writ denied); Tex.R.Civ.P. 166b(5) and 215(5). In addition, the determination that "good cause" exists is within the sound discretion of the trial court and it can only be set aside if that discretion was abused. *Ramos,* 750 S.W.2d at 877.

■ As stated above, the trial court in the instant case found that "good cause"

existed. Since the evidence in the instant case established that (1) the County originally designated Hunt and "a custodian of the Texas Water Control Board's records;" (2) as soon as the County became aware of the fact that Hunt no longer worked at the Water Control Board, it supplemented its answers to interrogatories; (3) Garza's testimony concerned the same subject matter as that of Hunt; and (4) Garza was the custodian of the Water Control Board's records, we cannot say that the trial court abused its discretion in the instant case. Accordingly, we will consider Garza's testimony in our review of the evidence introduced at trial. Appellants' eighth point of error is overruled.

The facts of this case are largely undisputed. In 1963, Victoria County acquired what is known as the Aloe Army Airfield from the U.S. Government. Included in the conveyance was a sewer plant which serviced the area (the Aloe sewer plant). The Victoria County Commissioners appointed an Airport Commission to oversee the operations of the Aloe sewer plant. In 1978 and 1979, appellant Herndon Scott was the Chairman of the Airport Commission.

The record reflects that in the late 1970's SBT Company Unit II, a Texas partnership consisting of Herndon Scott and other partners, acquired unrestricted undeveloped land in the Aloe area to develop a residential subdivision called "Quail Creek." Appellants are all developers who bought various sections of land from either SBT Company Unit II or one of the subdividers. The evidence established that Herndon Scott made representations to the other developers that sewer service would be available. In fact, the evidence established that when the undeveloped lots were sold by SBT Company Unit II, one of the conditions of sale was that a contribution of $1,000 for every lot sold would be made by each developer to build a new sewer plant. Likewise, there was evidence introduced at trial that Herndon Scott had made several representations that he intended to build a new sewer plant to service the subdivision. The amount of money collected by Herndon Scott for this purpose was controverted at

trial. It was not established what was done with the money collected; however, it was established that a new sewer plant was never built.

The record reveals that after appellants purchased the land, they placed deed restrictions on their lots. Specifically, they restricted the use of the lots of single family residences. In 1977 and 1978, the Commissioners' Court approved the map and plats for the Quail Creek subdivision and, thereafter, the designated water and sewer lines were dedicated to the County. Notwithstanding the fact that the County approved the map and a plat of the subdivision, the evidence established that there was no agreement between the County and the developers that the County would provide sewer service to the subdivision.

In 1978 and 1979, substantial development of the area occurred which resulted in the building of numerous residential dwellings. During this period of time, all developed tracts were granted sewer permits from the County and were provided with sewer service from the Aloe sewer plant. It was undisputed that, prior to the development of the Quail Creek subdivision, the Aloe sewer plant operated in substantial compliance with its operating permit granted to it by the Texas Water Control Board. In 1978 and 1979, however, the sewer plant became overloaded due to the increase in the number of homes serviced by the sewer system. This overload resulted in a "system shut down" which caused enormous amounts of raw sewage to be discharged into a nearby creek. It was undisputed that, at this point, the Aloe sewer system was not in compliance with the conditions of its operating permit or with state and federal regulations. Therefore, on May 18, 1979, the County issued an order prohibiting the issuance of any *future* permits connecting to the sewer system. It is important to note that all permits previously granted by the County were not revoked.

The evidence introduced at trial established that the Aloe sewer plant continued to operate in violation of its permit and the law until 1984. In fact, J.A. House, an employee of the County, testified at trial

that he worked at the Aloe sewer plant from 1961 to 1986 as a plant operator. House testified that the Aloe sewer plant was not in compliance with its permit until November of 1984. House further testified that during the period the moratorium was in effect, the County expended funds and hired engineers in an attempt to get the plant back into compliance with its permit.

Likewise, Mickey Garza, an employee of the Texas Water Control Board, testified at trial. According to Garza, the Texas Water Control Board's records concerning the Aloe sewer plant revealed that from 1978 to 1984 the Aloe sewer plant was not in compliance with the conditions of its permit and it was operating in violation of the law. He further testified that the plant was releasing between 150,000 gallons to 900,000 gallons of raw sewage per month into a nearby creek. Garza testified that the operation of the plant from 1978 to October of 1984 constituted a danger to the health and safety of humans, wildlife, and aquatic life. According to Garza, it would have further endangered the lives and health of the public if the County had permitted additional hookups to the sewer plant during this period of time.

The record further reveals that after the moratorium was issued, appellants and the County engaged in a series of transactions basically attempting to alleviate the crisis. The County and appellants entered into a series of negotiations whereby the County was to sell the sewer plant to appellants or another willing buyer for the consideration of $1.00. All of the attempted sales failed until 1986. In 1986, the appellants formed

a utility district and the County transferred the ownership of the sewer plant to the utility district, which resulted in the termination of the sewer moratorium.

On appeal, the County contends that the above evidence established that the sewer moratorium was a valid exercise of its police power, reasonable and necessary to protect the health and safety of its citizens. Appellants do not address the County's cross-point in their brief; however, appellants did state in their brief that the "shut down of the plant in 1979 was probably appropriate temporarily, [but] that there was no necessity for a total shut down for seven years." [2]

At trial appellants essentially contended that there was a taking because (1) the moratorium was unreasonable or arbitrary because it rendered their property wholly useless for seven and a half years; (2) the moratorium was unreasonable in its duration; and (3) the County had a duty to upgrade the sewer to accommodate their development.[3] Upon careful review of the record, we find that as a matter of law, appellants did not establish that there was a taking.

The Fifth Amendment to the United States Constitution provides that private property shall not be taken for public use without just compensation. The provision is applicable to the states under the due process clause of the Fourteenth Amendment. The Texas Constitution also contains a "takings clause." Article 1, section 17 provides in part that "No person's property shall be taken, damaged or destroyed for or applied to public use without ade-

2. Likewise, during oral argument, appellants again asserted that the ordinance was necessary in 1979; however, they argued that the evidence established that in 1980 the ordinance was no longer necessary. We find this argument without merit. As discussed above, the evidence established that the sewer plant was not operating in compliance until 1984.

3. All of the appellants testified at trial that they were denied all use of their land because, pursuant to the deed restrictions, the land could only be used for residential purposes and no residences could operate without sewer service. Appellants also alleged that the only sewer system available to the area was the Aloe sewer

plant because the County had enacted a septic tank ordinance in December of 1977, which provided that no person may install private septic tanks on a lot smaller than ½ acres, unless served by a community water supply, and that no person may be granted a permit to construct a private sewage facility any part of which is within 200 feet of horizontal distance to an organized disposal system. Appellants contended that since their lots were within 200 feet of horizontal distance to the Aloe disposal system, they were precluded from putting in private septic tanks. Appellants do not challenge the County's action in adopting this ordinance.

quate compensation being made, unless by consent of such persons...."

■ These constitutional provisions do not prohibit the taking of private property. They do, however, place a condition on the exercise of that power, i.e., securing compensation in the event of a taking. It is not necessary for there to be a physical invasion upon the property in order for there to be a taking. An unreasonable interference with the right of access to one's property is recognized as a compensable taking even if the interference is temporary. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California,* 482 U.S. 304, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987); *DuPuy v. City of Waco,* 396 S.W.2d 103 (Tex.1965); *San Antonio River Authority v. Garrett Brothers,* 528 S.W.2d 266, 273 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.).

■ All property, however, is held subject to the valid exercise of the police power and compensation is generally not required for losses resulting therefrom. *See City of College Station v. Turtle Rock Corp.,* 680 S.W.2d 802, 804 (Tex.1984); *Woodson Lumber Co. v. City of College Station,* 752 S.W.2d 744, 746 (Tex.App.—Houston [1st Dist.] 1988, no writ). As the United States Supreme Court stated in *Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 326, 62 L.Ed.2d 210 (1979) "government regulation—by definition—involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by *purchase.*" As Justice Holmes stated in the landmark decision of *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922) "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized some values are enjoyed under an implied limitation and must yield to the police power."

■ Thus, the deprivation of one traditional property right will not always constitute a taking. "Where an owner possesses a full bundle of property rights, the destruction of one strand of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus,* 100 S.Ct. at 327. Likewise, the fact that a regulation may prevent the most profitable use of property does not conclusively establish that there has been a taking. *Id.*

■ Accordingly, it has been held that a governing body that adopts reasonable regulations to promote the health, safety, and general welfare of its people engages in a valid exercise of its police power. *Turtle Rock Corp.,* 680 S.W.2d at 805; *Garrett Brothers,* 528 S.W.2d at 274. However, if a governing body, in the exercise of its police power, enacts a regulation that goes "too far" in the regulation of private property, that governing body may be held to have taken the property requiring it to pay compensation to the owner. *Turtle Rock Corp.,* 680 S.W.2d at 804.

■ The question of whether a police power regulation is proper or whether it constitutes a compensable taking is a question of law and not of fact. *Turtle Rock Corp.,* 680 S.W.2d at 804; *DuPuy,* 396 S.W.2d at 110; *Woodson Lumber Co.,* 752 S.W.2d at 747. There is no "bright line rule" for distinguishing when an exercise of police power constitutes a taking and when it does not. *Turtle Rock Corp.,* 680 S.W.2d at 804. In the *City of Austin v. Teague,* 570 S.W.2d 389, 391 (Tex.1978) Justice Pope articulated the problem with this distinction as follows:

The labels are not helpful. These two doctrines—police power and eminent domain—merge at so many places when applied to specific problems, that the legal battlefields have been variously termed a 'sophistic Miltonian Serbonian Bog,' *Brazos River Authority v. City of Graham,* 163 Tex. 167, 176, 354 S.W.2d 99, 105 (1962); a 'crazy-quilt pattern,' *San Antonio River Authority v. Garrett Brothers,* 528 S.W.2d 266, 273 (Tex. Civ.App.—San Antonio 1975, writ ref'd n.r.e.); 'the manifest illusoriness of dis-

tinctions,' *DuPuy v. City of Waco*, 396 S.W.2d 103, 107 (Tex.1965); producing decisions that are 'conflicting, and often ... irreconcilable in principle.' *Sauer v. City of New York*, 206 U.S. 536, 548, 27 S.Ct. 686, 690, 51 L.Ed. 1176 (1906). Accordingly, the determination of whether an ordinance constitutes a taking depends upon the facts of each case.

■ The Texas Supreme Court recently held that in order for an "ordinance to be a valid exercise of the city's police power, not constituting a taking, there are two related requirements. First the regulation must be adopted to accomplish a legitimate goal; it must be 'substantially related' to the health, safety, or general welfare of the people. Second, the regulation must be reasonable; it cannot be arbitrary." *Turtle Rock Corp.*, 680 S.W.2d at 805. There is a presumption which favors the reasonableness and validity of the ordinance, and this presumption places an "extraordinary burden" on the party attacking the ordinance. *Id.*

■ The following factors are also to be considered when determining the issue of whether a taking has occurred: (1) whether the property was rendered wholly useless; (2) whether the governmental burden created a disproportionate diminution in economic value or caused a total destruction of the value; or (3) whether the government's action against an economic interest of an owner was for its own advantage. *Teague*, 570 S.W.2d at 393.

■ A review of the record reveals that the evidence conclusively establishes the following: (1) the sewer moratorium was adopted for a legitimate purpose substantially related to the health, safety, and general welfare of the public; (2) the government's action in prohibiting additional sewer hookups was not for its own advantage; (3) the regulation was reasonable and not arbitrary; and (4) the sewer moratorium

did not render appellants' land wholly useless nor did it totally destroy the land's value. *See Wincamp Partnership, OTC v. Anne Arundel County, Maryland*, 458 F.Supp. 1009 (D.Md.1978); *Smoke Rise, Inc. v. Washington Suburban Sanitary Comm'n*, 400 F.Supp. 1369 (D.Md.1975).

As discussed above, the evidence in the instant case established that there was a crisis situation at the Aloe sewer plant. It was uncontroverted that the plant was not operating in compliance with its permit or in compliance with the law. The evidence conclusively established that the moratorium was necessary to prevent a further hazard to the health and safety of the public. Furthermore, the evidence does not establish that the County enacted this moratorium for its own advantage or to advance a "no growth" Policy.[4]

Likewise, it is the opinion of this court that appellant did not establish that the moratorium was unreasonable or arbitrary. As pointed out above, appellants seemed to allege that the moratorium was unreasonable in terms of its duration and that the County had a duty to upgrade the sewer system. Again, the evidence introduced at trial established the contrary. The Aloe sewer plant was not in compliance with its permit until 1984. There was no agreement between the County and appellants that the County would provide sewer service to appellants at any time. Instead, the evidence established that the appellants had the option to build their own sewer system or take over the existing sewer system which they opted not to do until 1986.

Finally, we note that appellants' contention that the moratorium in the instant case rendered their property wholly useless is without merit. Appellants themselves, not the County, restricted the use of the undeveloped land to residential dwellings. Accordingly, *the ordinance itself* neither rendered the developer's property wholly use-

---

4. During oral arguments appellants argued that the County did not upgrade the system to allow additional hookups because it wanted to sell the sewer system so that it would not have to expend any more funds on the plant. However, the evidence established that in 1982 the attorney general issued an opinion that stated that the County had no authority to operate the sewer system and no authority to incur indebtedness to finance the construction, operation, or the maintenance of the sewer system. The propriety of this opinion is not before us.

less nor did it cause a total destruction of the land's economic value. The fact that the ordinance may hinder the most profitable use of the property does not establish that there has been a taking in the instant case.

Furthermore, appellants merely had an expectancy that sewer service would be provided. We find that the mere expectancy of sewer service, in the absence of a contract, is not a vested property right, and the temporary loss thereof does not constitute such a substantial interference with property rights that it amounts to a taking without compensation. Accordingly, we find that the County did not take appellants' property as a matter of law. The County's cross-point is sustained.

By point nine, appellants claim the trial court erred in refusing to consider their claim under 42 U.S.C. § 1983. The § 1983 claim was premised upon the commissioners court acting under color of law when they imposed a ban on additional sewer hookups which resulted in a taking. Because we have determined that no taking occurred, we overrule point nine.

We need not address appellants' remaining points of error since they are not dispositive of this appeal.

The judgment of the trial court is AFFIRMED on other grounds that appellants take nothing.