OFFICE OF THE ATTORNEY GENERAL · STATE OF TEXAS



November 10, 1999

The Honorable Bill G. Carter                    Opinion No. JC-0142
Chair, Committee on Urban Affairs
State of Texas House of Representatives          Re: Whether a home-rule municipality may limit
P.O. Box 2910, GW.16                             the number of building permits it will issue in the
Austin, Texas 78768-2910                         absence of an emergency, and related question
                                                 (RQ-0061-JC)

Dear Representative Carter:

You question the authority of a home-rule municipality to limit the number of building permits it will issue in the absence of an emergency. *See* Letter from Honorable Bill G. Carter, Chair, Committee on Urban Affairs, Texas House of Representatives, to Honorable John Cornyn, Attorney General of Texas (Apr. 26, 1999) (on file with Opinion Committee) [hereinafter "Request Letter"]; Brief accompanying Request Letter, *supra*, at 1. You also ask whether a home-rule municipality may limit the number of residential building permits issued in a given time period while not limiting the number of nonresidential building permits. Subject to various caveats, we conclude first that nothing in federal or Texas law precludes a home-rule municipality from limiting the number of building permits it will issue, even in the absence of an emergency, in a given time period. We conclude second that a home-rule municipality may impose limits on residential building permits and not nonresidential building permits, subject to the equal protection clauses of the federal and State constitutions.

In January 1999 the Town of Flower Mound (the "Town"), a home-rule municipality, resolved to adopt a SMART Growth program in response to higher than expected rates of population growth in recent years. *See* Brief accompanying Request Letter, *supra*, at 1. ("SMART Growth" stands for "Strategically Managed And Responsible Town Growth." *See* Brief from Terrence S. Welch, Bickerstaff, Heath, Smiley, Pollan, Kever & McDaniel, L.L.P., on behalf of Town of Flower Mound, attachment 2 (June 16, 1999) [hereinafter "Town brief"]; Brief from Arthur J. Anderson, Winstead Sechrest & Minick P.C., on behalf of Home & Apartment Builders Association of Greater Dallas, to John Cornyn, Esq., Attorney General, exhibit "C" at 24 (June 4, 1999) [hereinafter "Home & Apartment Builders Brief"]). Expecting that the population growth would overload the Town's water, wastewater, and transportation systems and would adversely affect the Town's "character and quality," *see* Brief accompanying Request Letter, *supra*, at 1, the Town council intends the SMART Growth program to "manage both the rate and character of residential growth in Flower Mound."

*See* Town Brief, *supra*, attachment 2 at 4; Home & Apartment Builders Brief, *supra*, exhibit "C" at 25. The Town's Resolution No. 1-99, providing for the SMART Growth program, articulates the Town's rationale:

> WHEREAS, during an October 1998 review of preliminary data with the Town's impact fee consultants, it became apparent that the Town's continued ability to provide adequate service levels to existing residents and businesses was rapidly being jeopardized;
>
> WHEREAS, the threat to the Town's ability to meet existing and near-term service demands is attributable to exploding population growth and (1) rapidly increasing water consumption, (2) rapidly increasing wastewater flows, and (3) increasing transportation system difficulties;
>
> . . . .
>
> WHEREAS, it is the objective of the Town to (1) achieve the community vision embodied in the Town's 1994 Comprehensive Master Plan, (2) ensure the Town's continuing ability to maintain adequate water and wastewater service while constructing system improvements to accommodate both residential and non-residential growth, (3) prevent increased traffic congestion and further deterioration of traffic safety and mobility while constructing transportation system improvements to accommodate both residential and non-residential growth, (4) maintain adequate water and wastewater capacity to sustain economic development efforts that will reduce the extreme imbalance in assessed valuation between residential and non-residential development, (5) preserve and enhance the unique character and lifestyle that currently exists in Flower Mound and (6) mitigate the ill effects of rapid and intense urbanization, such as overcrowding, overburdened infrastructure and municipal services, traffic congestion, loss of open space and agricultural land, environmental degradation and loss of a sense of place;
>
> WHEREAS, the exemption of non-residential development is necessary to the long-term economic health of the Town . . . .

FLOWER MOUND, TEXAS, RESOLUTION NO. 1-99, Preamble, at 1-2.

The SMART Growth program has four components:

(1)   An update of the Town's 1994 Comprehensive Master Plan and a reaffirmation of the community vision embodied in the 1994 Comprehensive Master Plan;

(2)   A temporary moratorium applicable to residential Master Plan amendments, residential zoning amendments and residential development plans, ensuring future development will be consistent with the community vision expressed in the updated Comprehensive Master Plan;

(3)   Amendments to the Town's Building Code providing that residential building permits are valid for forty-five (45) days without construction commencing; and

(4)   Consideration, after the update of the Comprehensive Master Plan and analysis of the Town's water, wastewater and transportation systems, *of the need and feasibility of a plan to manage and equitably apportion residential building permits* in a manner that ensures the Town's ability to maintain a defined level of service while accommodating reasonable and sustainable residential and non-residential growth.

*Id.* § 3, at 3 (emphasis added). You ask only about the fourth component of the plan, consideration of a growth-management plan that apportions, or "caps," the number of residential building permits the Town will issue in a specified time period (the "growth-management plan").

We consider only municipal authority generally to implement a growth-management plan. We do not consider a particular growth-management plan, and we cannot evaluate any of the various grounds on which the Town may choose to apportion building permits, *e.g.*, aesthetic considerations, location, first-come-first-served, or random selection. *See generally* LAWRENCE B. BURROWS, GROWTH MANAGEMENT: ISSUES, TECHNIQUES AND POLICY IMPLICATIONS 83-91 (1978) (describing annual permit limitations). Nor do we consider the accuracy of any of the various conflicting factual allegations regarding the capacities of the Town's water, waste water, and transportation systems. *Compare* Brief accompanying Request Letter, *supra*, at 1 *and* Home & Apartment Builders Brief, *supra*, at 4-5 *with* Town Brief, *supra*, at 8-16. The opinion process is an inappropriate forum for resolving factual disputes. *See, e.g.*, Tex. Att'y Gen. Op. Nos. JC-0032 (1999) at 4; JC-0027 (1999) at 3; JC-0020 (1999) at 2. Finally, in responding to your questions, we assume, without making any findings on the issue, that no emergency situation justifies the allegedly proposed apportionment.

Because it is a home-rule municipality, the Town may exercise any governmental power that the legislature has not withheld from it. *See Lipscomb v. Randall*, 985 S.W.2d 601, 605 (Tex. App.–Fort Worth 1999, pet. dism'd) (stating that Town has "full power of self government"); *see also Proctor v. Andrews*, 972 S.W.2d 729, 733 (Tex. 1998) (citing *Lower Colo. Riv. Auth. v. City of San Marcos*, 523 S.W.2d 641, 643 (Tex. 1975) (stating that legislature may only limit power of, but may not grant power to, home-rule municipality). A home-rule municipality has "all the powers of the state not inconsistent with the Constitution, the general laws, or the city's charter." *Proctor*, 972 S.W.2d at 733 (citing TEX. CONST. art. XI, § 5). The legislature may circumscribe a home-rule municipality's broad power, but only if it docs so "'with unmistakable clarity.'" *Id.* (citing, *e.g., Dallas Merchant's & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 490-91 (Tex. 1993); *City of Sweetwater v. Geron*, 380 S.W.2d 550, 552 (Tex. 1964)); *City of Santa Fe v. Young*, 949 S.W.2d 559, 560 (Tex. App.–Houston [14th Dist.] 1997, no writ). Consequently, with respect to each of your questions, we analyze first whether a growth-management plan comports with state and federal law. (We assume that an ordinance adopting a growth-management plan is authorized by the city's charter.) Second, we consider whether the legislature has, "with unmistakable clarity," limited a home-rule municipality's authority to adopt a growth-management plan.

With certain caveats, we conclude that a home-rule municipality may, even in the absence of an emergency, limit the number of building permits the municipality will issue in a given period of time. First, a growth-management plan does not appear to be generally inconsistent with constitutional and statutory law. Second, the legislature has not, with "unmistakable clarity," forbidden a home-rule municipality to adopt a growth-management plan in the absence of an emergency.

A.    **Whether, in the absence of an emergency, a home-rule municipality may implement a growth-management plan, which limits the number of building permits the municipality will issue in a given period of time?**

The general concept of a growth-management plan does not per se facially contravene federal or state constitutional provisions. The Town must, however, adopt a growth-management plan in compliance with constitutional requirements regarding substantive and procedural due process. *See* U.S. CONST. amend. XIV, § 1. Substantive due process is satisfied if a generally applicable ordinance "is designed to accomplish an objective within the government's police power and if a rational relationship exists between the ordinance and its purpose." *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 938 (Tex. 1998), *cert. denied*, 119 S. Ct. 2018 (1999). Procedural due process requires the government to provide a building permit applicant "an appropriate and meaningful opportunity to be heard." *Id.* at 939. Depending on the particular facts surrounding the denial of a building permit application, we can imagine that a municipality might run afoul of one or more of these constitutional doctrines.

Nor does a growth-management plan in the abstract contravene state statutory law. We have examined chapters 211, 212, and 214 of the Local Government Code. Chapter 211 provides municipal zoning authority. *See* TEX. LOC. GOV'T CODE ANN. § 211.003(a) (Vernon 1999). Chapter

212 pertains to municipal regulation of subdivisions and property development. *See id.* § 212.002. Chapter 214 authorizes a municipality to regulate substandard buildings, *see id.* § 214.001; to regulate plumbing and sewers, *see id.* § 214.012; to regulate swimming-pool enclosures, *see id.* § 214.101; to formulate energy-conservation standards, *see id.* § 214.901; and to establish rent control, *see id.* § 214.902. None of these statutes preclude or conflict with a home-rule municipality's authority to adopt a growth-management plan.

Moreover, a growth-management plan would appear to be consistent with section 219.002 of the Local Government Code, which authorizes the governing body of a municipality to adopt a comprehensive plan to guide the municipality's long-range development. *See id.* §§ 219.002(a), .003 (permitting municipality to adopt or amend comprehensive plan by ordinance following public hearing). The municipality may use its comprehensive plan to "coordinate and guide the establishment of development regulations." *Id.* § 219.002(b). Although chapter 219 does not define "development regulations," we believe that it would encompass municipal ordinances that restrict how land may be developed. *See id.* § 401.003(a) (requiring home-rule municipality that "regulates and controls the use and development" of watersheds and flood-prone areas to file notice); David Hartman, Comment, *Risky Business: Vested Real Property Development Rights–The Texas Experience and Proposals for the Texas Legislature to Improve Certainty in the Law*, 30 TEX. TECH. L. REV. 297, 325 (1999) (describing Hawaii and California statutes freezing existing development regulations, *i.e.*, laws "governing permitted uses of the land" and regulations "applicable to development of the property") (quoting HAW. REV. STAT. § 46-127(b) (1996) & CAL. GOV'T CODE § 65866 (West 1996)).

We further must conclude that the legislature has not, "with unmistakable clarity," limited a home-rule municipality's authority to implement a growth-management plan that limits the number of building permit applications the municipality will issue per year. Again, looking at chapters 211, 212, 214, and 219 of the Local Government Code, *see supra*, we find no statute that clearly forbids a municipality to implement a growth-management plan in the absence of an emergency. We accordingly conclude that, even in the absence of an emergency, a home-rule municipality may adopt a growth-management plan that limits the number of building permits the municipality will issue in a given time period.

A home-rule municipality may not, however, attempt to apply its growth-management plan to a building permit application filed before the plan was adopted. A municipality may apply its growth-management plan only to building permit applications filed subsequent to the adoption of the municipal ordinance enacting the plan. *See* TEX. GOV'T CODE ANN. § 245.002(a), *adopted by* Act of Apr. 29, 1999, 76th Leg., R.S., ch. 73, § 2, sec. 245.002, 1999 Tex. Sess. Law Serv. 431, 432-33; *Quick v. City of Austin*, 1999 WL 771291, *1 (Tex. 1999) (stating that legislature may statutorily alter common-law rule that right to develop property is subject to intervening regulation). Section 245.002 of the Government Code requires, with certain exceptions, a municipality to "consider the approval, disapproval, or conditional approval of an application for a permit solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements *in effect at the time the original application for the permit is filed*." TEX. GOV'T CODE ANN.

§ 245.002(a), *adopted by* Act of Apr. 29, 1999, 76th Leg., R.S., ch. 73, § 2, sec. 245.002, 1999 Tex. Sess. Law Serv. 431, 432 (emphasis added); *see id.* §§ 245.003 - .004, *adopted by* Act of Apr. 29, 1999, 76th Leg., R.S., ch. 73, § 2, secs. 245.003 - .004, 1999 Tex. Sess. Law Serv. 431, 433 (delimiting applicability of chapter and listing exemptions).

In its brief to this office, the Texas Association of Builders relies on *Estate of Scott v. Victoria County*, 778 S.W.2d 585 (Tex. App.--Corpus Christi 1989, no writ), for its argument that a home-rule municipality may not implement a growth-management plan in the absence of an emergency. *See* Home & Apartment Builders Brief, *supra*, at 4. The Association raises an important, different issue.

The issue you raise is whether a home-rule municipality may institute a growth-management plan. The issue in *Estate of Scott* is whether a temporary moratorium prohibiting additional sewer hookups in certain areas of the county constituted an unconstitutional taking for which the owners must be compensated. *See Estate of Scott*, 778 S.W.2d at 589-91. The appellants, who owned undeveloped tracts of land in Victoria County, claimed that the County unconstitutionally "'took' their property without just compensation" by issuing the temporary sewer moratorium. *Id.* at 586-87. Whether a home-rule municipality has authority to undertake an action is different from whether it must provide compensation for actions under the takings provision of either the federal or state constitution.

The Just Compensation Clause of the Fifth Amendment to the United States Constitution forbids the State to take private property for public use without just compensation. U.S. CONST. amend. V; *see Mayhew*, 964 S.W.2d at 933; *Estate of Scott*, 778 S.W.2d at 589. Article I, section 17 of the Texas Constitution similarly prohibits the taking of private property for public use "without adequate compensation being made." TEX. CONST. art. I, § 17; *see Mayhew*, 964 S.W.2d at 933; *Estate of Scott*, 778 S.W.2d at 589-90. A regulatory taking occurs if a municipal ordinance "'does not substantially advance legitimate state interests.'" *Mayhew*, 964 S.W.2d at 933 (quoting *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980)). The United States Supreme Court has recognized several governmental interests as legitimate:

> protecting residents from the "ill effects of urbanization[,]" *Agins*, 447 U.S. at 261 . . . ; enhancing the quality of life[,] *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 129 . . . (1978); and protecting a beach system for recreation, tourism, and public health[,] *Keystone [Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 488 (1987)]; *Esposito v. South Carolina Coastal Council*, 939 F.2d 165, 169 (4th Cir. 1991), cert. denied, 505 U.S. 1219 . . . (1992).

*Mayhew*, 964 S.W.2d at 934. "The 'substantial advancement' requirement examines the nexus between the effect of the ordinance and the legitimate state interest it is supposed to advance." *Id.* Even if a municipal ordinance substantially advances legitimate state interests, it may constitute a compensable regulatory taking if it (1) denies a landowner of all economically viable use of his or

her property, or (2) unreasonably interferes with a landowner's right to use and enjoy his or her property. *See id.* at 935.

Whether a growth-management plan effects an unconstitutional taking in a particular instance is an issue that only a court may resolve, taking into consideration numerous factual issues. *See id.* at 932; *Estate of Scott*, 778 S.W.2d at 590. For example, after examining the factual record in *Estate of Scott*, the court determined that the county had not "taken" appellants' property as a matter of law:

> [T]he evidence conclusively establishes the following: (1) the sewer moratorium was adopted for a legitimate purpose substantially related to the health, safety, and general welfare of the public; (2) the government's action in prohibiting additional sewer hookups was not for its own advantage; (3) the regulation was reasonable and not arbitrary; and (4) the sewer moratorium did not render appellants' land wholly useless nor did it totally destroy the land's value.

*See id.* at 591. Such fact-intensive inquiries may not be resolved in an attorney general opinion. *See, e.g.*, Tex. Att'y Gen. Op. Nos. JC-0032 (1999) at 4 (stating that question of fact is beyond purview of this office); JC-0027 (1999) at 3 (stating the questions of fact cannot be addressed in attorney general opinion); JC-0020 (1999) at 2 (stating that investigation and resolution of fact questions cannot be done in opinion process).

**B.      Whether a home-rule municipality may implement a growth-management plan that limits the number of residential building permits the municipality will issue and not the number of nonresidential building permits?**

Depending upon the specifics of the Town's growth-management plan or upon its application in a particular circumstance, a growth-management plan that limits only the issuance of residential building permits while not limiting the issuance of nonresidential building permits may implicate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *See* U.S. CONST. amend. XVI, § 1. The level of scrutiny with which a court would examine a growth-management plan depends upon whether the distinction between residential and nonresidential building permit applications discriminates against a suspect class or impinges upon personal fundamental rights. *See Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976); *Mayhew*, 964 S.W.2d at 939.

Where a suspect class or a personal fundamental right is not involved, the Equal Protection Clause precludes the government from treating one building permit applicant differently from other similarly situated applicants unless the government has a reasonable basis for doing so. *See Massachusetts Bd. of Retirement*, 427 U.S. at 312; *Mayhew*, 964 S.W.2d at 939. Distinguishing between residential and nonresidential building permit applications does not involve a patently suspect class, so a court probably would determine that this distinction need only be "rationally related to a legitimate state interest." *Mayhew*, 964 S.W.2d at 938. This is a relatively low

evidentiary standard to meet. A court may find that the Town's desire to ensure the Town's "long-term economic health," FLOWER MOUND, TEXAS, ORDINANCE NO. 2-99, constitutes a legitimate state interest and that restricting residential development is rationally related to this interest.

On the other hand, if a growth-management plan disparately affects a suspect class by, for example, discriminating against applicants on the basis of their racial or ethnic identity, *see* *Massachusetts Bd. of Retirement*, 427 U.S. at 312 n.4 (listing suspect classes), or impinges upon a personal fundamental right, such as the right to vote or to travel between the states, *see id.* at 313 n.3, a court will examine the plan more critically. *See id.* at 312. Using "strict scrutiny," the court will ascertain whether the Town has narrowly tailored the plan to serve a compelling state purpose. *See* Tex. Att'y Gen. Op. No. DM-384 (1996) at 4 (quoting *Zablocki v. Redhail*, 434 U.S. 374 (1978)). Even if the plan is patently neutral, a court may strictly scrutinize how the plan is applied if the court finds that the governing body intended to discriminate. *See Schleuter v. City of Fort Worth*, 947 S.W.2d 920, 934-35 n.11 (Tex. App.–Fort Worth 1997, writ denied) (Livingston, J., conc. & dissenting) (citing 3 RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE & PROCEDURE § 18.4, at 41-42 (2d ed. 1992)). It is more difficult to sustain an enactment that is subject to strict scrutiny review. Whatever challenges ultimately might be brought, and the viability of such challenges, obviously will depend on the specifics of the growth-management plan.

## S U M M A R Y

A home-rule municipality may implement a growth-management plan that apportions, or "caps," the number of building permits the municipality will issue in a specified time period even in the absence of an emergency. The municipality must provide appropriate substantive and procedural due process, and the municipality may not attempt to apply its growth-management plan to building permit applications filed prior to the adoption of the plan. *See* TEX. GOV'T CODE ANN. § 245.002(a), *adopted by* Act of Apr. 29, 1999, 76th Leg., R.S., ch. 73, § 2, sec. 245.002, 1999 Tex. Sess. Law Serv. 431, 432-33. The denial of a building permit application may constitute an unconstitutional taking for which the municipality must compensate the landowner.

A home-rule municipality may adopt a growth-management plan that limits the number of residential building permits, and not the number of nonresidential permits, the municipality will issue in a given time period. Depending on the facts of a particular situation, such a growth-management plan may implicate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Yours very truly,

JOHN CORNYN
Attorney General of Texas

ANDY TAYLOR
First Assistant Attorney General

CLARK KENT ERVIN
Deputy Attorney General - General Counsel

ELIZABETH ROBINSON
Chair, Opinion Committee

Kymberly K. Oltrogge
Assistant Attorney General - Opinion Committee