# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-04-00049-CV
---

**Donald H. Cummins, Betty Ann Bradfield Cummins, Thomas W. Cummins
and William Bradfield Cummins, Appellants**

**v.**

**Travis County Water Control and Improvement District No. 17, Appellee**

---
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
### NO. GN203636, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING
---

## O P I N I O N

Appellants Donald H. Cummins, Betty Ann Bradfield Cummins, Thomas W. Cummins, and William Bradfield Cummins own property on a high bluff overlooking Lake Travis and abutting land owned by appellee, the Travis County Water Control and Improvement District No. 17. In 2002, the Cumminses applied to the District for a license to build a boat dock on a part of the lake subject to the District's regulation. After the District denied the license, the Cumminses sought a declaratory judgment that they have rights to use and enjoy their land as waterfront property, inclusive of the right to construct a recreational boat dock, because they are riparian or littoral owners of land along the shore of Lake Travis or, in the alternative, because they possess an easement or quasi-easement entitling them to such rights.

The Cumminses also challenged two regulations that the District had enacted to protect restricted zones around its water intake barge; the Cumminses alleged that the first regulation, which prohibits all activity within a 200-foot radius and mandates that warning signs be placed along the shoreline, constitutes an inverse condemnation of their land and that the second regulation, which prohibits recreational boating activity within a 1000-foot radius, is invalid. The District responded with a motion for summary judgment, and the trial court granted it. The Cumminses appeal, asserting that the summary judgment should be reversed because genuine issues of material fact remain. Because the District satisfied its burden to establish its entitlement to summary judgment, and no genuine issues of material fact remain, we affirm the judgment.

## BACKGROUND

In Texas, water is a scarce natural resource that the State is obligated to conserve and protect for the benefit of the health, safety, and welfare of the general public. In accordance with this duty, the State has statutorily created several types of water districts with authority to regulate the uses of Texas's various bodies of water. The Travis County Water Control and Improvement District No. 17 is one such district, which has operated since 1958 as a political subdivision of the State of Texas, under the supervising authority of the Texas Commission on Environmental Quality,[1] for the purpose of providing an adequate supply of safe, potable water and ensuring the fiscally sound, environmentally responsible development and management of water resources and

---

[1] The TCEQ was formerly called the Texas Natural Resource Conservation Commission.

wastewater facilities. To further these objectives, in 1960 the District installed an "intake barge" in Lake Travis, which pumps raw water through pipes to the District's treatment facility, where the raw water is treated and made suitable for drinking.

Nearly two decades after the District was established, the Cumminses acquired title to the property immediately north of the District's land, when Betty Ann Bradfield Cummins inherited the property from her mother in 1975. The property had been in Mrs. Cummins's family (the Bradfields) since 1943. The Cumminses' property sits atop a steep bluff; its southern border converges with the District's northern border at the head of a small cove, and both properties overlook Lake Travis to the west. The District's intake barge is located in the waters of Lake Travis, approximately 110-120 feet from the shoreline of the cove.

In 1992, the Commission promulgated a substantive rule governing public water sources. 30 Tex. Admin. Code § 290.41(e)(2) (2004). The rule sets forth the actions water control and improvement districts are required to take to ensure an adequate supply of safe drinking water:

> [i]ntakes shall be located and constructed in a manner which will secure raw water of the best quality available from the source. . . . (B) Raw water intakes shall not be located within 1,000 feet of boat launching ramps, marinas, docks, or floating fishing piers which are accessible by the public. (C) A restricted zone of 200 feet radius from the raw water intake works shall be established and all recreational activities and trespassing shall be prohibited in this area. Regulations governing this zone shall be in the city ordinances or the rules and regulations promulgated by a water district or similar regulatory agency. The restricted zone shall be designated with signs recounting these restrictions. The signs shall be maintained in plain view of the public and shall be visible from all parts of the restricted area. . . . Provisions shall be made for the strict enforcement of such ordinances or regulations.

*Id*. Pursuant to this rule, the District enacted its own regulations in 1998, including Regulation 6.5.3.2, which establishes a "clear zone" around the District's raw water intake barge. Reg. 6.5.3.2, *Protection of Water Intakes*. The regulation prohibits "[a]ll activity not related to the maintenance of the barge or intake" within 200 feet. Starting from the barge, the 200-foot radius encompasses parts of the lake, as well as the cove where the southernmost corner of the Cumminses' property abuts the northernmost corner of the District's land. The regulation also prohibits "[a]ll recreational boating activity within 1000 feet." The 1000-foot radius, also extending outward from the barge, covers more than half of the Cumminses' property and a large portion of the District's land. Finally, the District's regulation mandates that "[s]igns advising the general public of this order shall be posted along the shoreline . . . [and] should read 'Restricted Zone, Potable Water Intakes Within 200 Feet, Trespassing Prohibited.'" Within a few months of adopting Regulation 6.5.3.2, the District placed an order with a sign company for signs stating in large, bold letters, "Restricted Zone: Potable Water Intakes, Trespassing Prohibited within 200 feet" and "Keep Clear: Submerged Cable and Mooring Lines Below; High Voltage."

Following the enactment of the District's regulations, the Cumminses subdivided their property into six lots. Lots 1, 4, 5, and 6 are each lakefront properties, while Lots 2 and 3 are landlocked. Because of the land's location atop a steep bluff, all six lots offer lakefront views. Lot 6 is the southernmost plot, running alongside the northern border of the District's land, and converging at the small cove about 115 feet inland from the intake barge. The entire shoreline of Lot 6 falls within the 200-foot "clear zone."

4

In October 1999, the Cumminses prepared a boundary agreement stating that the boundary lines between their property and the District's property were defined by "the most Southerly boundary line of Lot 6," and "the 670-foot contour line[2] as the most Westerly boundary." A map of the property was attached to the agreement; the map reinforces the terms of the agreement by labeling the 670-foot contour line, which is shown running along the western border of the Cumminses' property, as the "agreed boundary line."

In 2002, the Cumminses applied to the District for a license to construct a boat dock extending from their property over the waters and submerged lands of Lake Travis, which are held by the State in trust for the public. When the District refused to grant the Cumminses' application for a license, the Cumminses sought a declaratory judgment. The Cumminses claimed that, because their chain of title conveyed waterfront property, they had littoral or riparian rights entitling them to construct a recreational boat dock on the submerged lands below the 670-foot contour line. Alternatively, they claimed to have a valid easement or quasi-easement to use and enjoy their land as lakefront property, which included the right to construct such a dock. The Cumminses additionally challenged the District's regulations, claiming that the 200-foot and warning-sign regulations constituted an inverse condemnation—a taking for which the Cumminses should be compensated—and that the 1000-foot regulation was invalid.

---

[2] In 1938, when Mansfield Dam was under construction, the Lower Colorado River Authority adopted contour lines—as designated by the United States Geological Survey Bench Marks—establishing the lake's average elevation, measured by feet above sea level. *Capitol Rod & Gun Club v. Lower Colo. River Auth.*, 622 S.W.2d 887, 889 (Tex. App.—Austin 1981, writ ref'd n.r.e.).

The District filed a Rule 166a(c) motion for summary judgment with evidence attached.[3] *See* Tex. R. Civ. P. 166a(c). The District asserted that the Cumminses are not littoral or riparian owners and that they are not entitled to moor a boat dock on the submerged land because they do not hold title to that land, which is regulated by the District pursuant to authority delegated by the State, and because the Cumminses do not have any easements over that land. The District also supported the validity of its regulations, asserting that they do not constitute an inverse condemnation of the Cumminses' property.

The trial court granted the District's motion, denying each of the Cumminses' claims. The Cumminses appeal, urging that the summary judgment should be reversed because genuine issues of material fact remain regarding whether (1) the Cumminses have riparian or littoral rights appurtenant to their land; (2) the Cumminses have an easement or quasi-easement to use and enjoy their land as waterfront property; (3) their land has been inversely condemned by the District's 200-foot and warning-sign regulations; and (4) the 1000-foot regulation is invalid.

**STANDARD OF REVIEW**

We review the district court's grant of summary judgment *de novo*. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and

---

[3] The following were attached as evidence: (1) the affidavit of Deborah Gernes, General Manager for the District; (2) a copy of District Regulation 6.5.3.2; (3) a copy of the District's order form from the sign company; (4) minutes of the District's board meetings showing that Donald Cummins was previously a member of the District's Board of Directors; (5) articles and reports about the hazards of gas chemicals from boats in water; (6) a copy of the 1999 Boundary Agreement with the map attached; and (7) the affidavit of Claude Hinkle, an expert surveyor, with copies of several deeds from the Cumminses' chain of title attached.

6

resolve any doubts in the nonmovant's favor. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985). A defendant who moves for summary judgment under Rule 166a(c), as here, is entitled to have its motion granted if it conclusively negates at least one of the essential elements of the plaintiff's cause of action or if it conclusively proves each element of its affirmative defense, thereby showing that it, as the movant, is entitled to judgment as a matter of law and no genuine issues of material fact remain. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222-23 (Tex. 1999). The defendant must support its motion with proper summary judgment evidence. Tex. R. Civ. P. 166a(c). Only if the defendant meets its burden does the burden shift to the plaintiff, as the nonmovant, to establish that a genuine issue of material fact remains. *Id*. If the trial court does not specify the grounds upon which the summary judgment was granted, as here, the judgment can be affirmed if any of the theories advanced are meritorious. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989). Because the District established that it was entitled to a judgment as a matter of law on each of the Cumminses' claims, and no genuine issues of material fact remain, we affirm the judgment.

## ANALYSIS

**Riparian and Littoral Rights**

The Cumminses assert in their second and fourth[4] issues that, because their property borders a lake, they have littoral rights "to use their property as waterfront property." The District

---

[4] The Cumminses' second issue asserts that they have littoral rights in their entire parcel of land, while their fourth issue asserts, in the alternative, that they have littoral rights in Lots 1-5, but not in Lot 6. We address these issues together.

7

asserts that the Cumminses' property is not vested with either riparian or littoral rights and that, even if it were, those rights would not entitle the Cumminses to moor a private, recreational boat dock on the District's land.

Initially, in their petition for declaratory judgment, the Cumminses asserted that they "have riparian or littoral rights to construct docks and other improvements needful to their use of their property as waterfront property" and that the "rights to use their property as waterfront property . . . include the right to construct boat docks to serve the property." The Cumminses' argument in their summary judgment response similarly focused on their right to construct a boat dock; they asserted, "persons with littoral rights have the right to build docks on their water front." On appeal, however, the Cumminses advanced a more general claim that they have littoral rights to use their land "as waterfront property," without confining the issue to whether or not those rights entitle them to construct a boat dock. The District, on the other hand, has continuously maintained both that the Cumminses have no littoral rights and that, even if they do, they are not entitled to construct a boat dock on land held by the State and regulated by the District. We will first address the general issue of whether the Cumminses have littoral rights and will then address the specific issue of whether they are entitled to construct a boat dock.

In raising the littoral rights issue, the Cumminses join centuries of Texas landowners whose private rights to use the water adjacent to their land have clashed with the State's right to regulate waters for the general welfare of the people. *See Barshop v. Medina Underground Water Conservation Dist.*, 925 S.W.2d 618, 623 (Tex. 1996). In recent years, the "interest and urgency" in the ongoing battle between private and public rights to Texas water has grown, based on the

8

increasing awareness that water is "a scarce natural resource vital to the public," which must be conserved. *City of Austin v. Hall*, 57 S.W. 563, 565 (Tex. 1900) (scarce resource); Madison Rayburn, 1 Condemnation § 3.16, at 25 (1998) (growing interest) (hereinafter *Rayburn*); Frank F. Skillern, I Texas Water Law 69 (1992) (since 1982, Texas has heightened its focus on conservation of water resources and protection of water quality) (hereinafter *Skillern I*). As here, many disputes have centered on whether a waterfront property owner has riparian or littoral rights in the land and, if so, what uses those rights entitle the owner to make of the land.

As an initial matter, we must address and define the terms "riparian" and "littoral." Although the Cumminses refer primarily to "littoral" rights in their appellate brief, they used the terms "riparian" and "littoral" interchangeably in their previous pleadings, in their reply briefs, and at oral argument before this Court. The District likewise referenced both riparian and littoral rights. In Texas jurisprudence, riparian and littoral rights are treated similarly, and the terms are used interchangably,[5] but "riparian" refers to the waters of rivers and streams, while "littoral" refers to the waters of lakes, seas, and oceans. *See Black's Law Dictionary* 945, 1328 (7th ed. 2001). Even still, many authorities employ "riparian" as a blanket term to refer to a landowner's rights regarding any type of waterfront property, without distinguishing the rights as "littoral" when discussing lakefront properties. *Filipos v. Chouke*, 40 S.W.2d 38, 40 (Tex. 1931) (riparian rights discussed in reference to creeks, bayous, lakes, and coves); *Humphreys-Mexia Co. v. Arseneaux*, 297 S.W. 225, 229 (Tex.

---

[5] The Cumminses acknowledged in their summary judgment response that a waterfront property owner's rights "to use the water appear to be the same whether the rights are called littoral or riparian and the terms are sometimes used interchangeably." Moreover, in an *amicus curiae* brief, the LCRA discussed the history and nature of riparian rights as pertinent authority for whether the Cumminses have littoral rights.

1927) (riparian rights attach to natural lakes and ponds); *Richter v. Granite Mfg.*, 174 S.W. 284, 286 (Tex. 1915) (discussing riparian rights in terms of lakefront property); *Welder v. State*, 196 S.W. 868, 870 (Tex. Civ. App.—Austin 1917, writ ref'd) (same); *Gibson v. Carroll*, 180 S.W. 630, 632 (Tex. Civ. App.—San Antonio 1915, no writ) (land bordering Corpus Christi Bay was "riparian"); W. Hutchins, Texas Law of Water Rights 332 (1961) ("word 'riparian' pertains to the bank of a river, or lake, or tidewater") (hereinafter *Hutchins*). That said, there are cases distinctly using the term "littoral" to describe the rights attached to certain lands affronting lakes, seas, and other bodies of water. *Norrell v. Aransas County Navigation Dist. No. 1*, 1 S.W.3d 296, 298 n.1 (Tex. App.—Corpus Christi 1999, no pet.) ("Littoral property rights are appurtenant to land which borders a lake or sea."); *Natland Corp. v. Baker's Port, Inc.*, 865 S.W.2d 52, 57 (Tex. App.—Corpus Christi 1993, writ denied) (littoral rights defined as "[s]horeline property owners' rights"); *City of Port Isabel v. Missouri Pac. R.R. Co.*, 729 S.W.2d 939, 942 (Tex. App.—Corpus Christi 1987, writ ref'd n.r.e.) (land adjacent to Laguna Madre was "littoral"); *City of Corpus Christi v. Davis*, 622 S.W.2d 640, 646 (Tex. App.—Austin 1981, writ ref'd n.r.e.) ("Littoral rights are appurtenant to the land which borders a lake or sea."); *see also* Tex. Nat. Res. Code Ann. § 61.001 (West 2001) (defining "littoral owner" as "owner of land adjacent to the shore" of beaches and dunes).

While we recognize that "littoral" is the precise term to describe water rights in relation to lakefront properties, the above cases make clear that the nature of littoral rights is parallel to that of riparian rights. Because the term "riparian" is frequently discussed in relation to all types of waterfront properties, including lakefront properties, our analysis is guided by the cases and authorities discussing the history of riparian rights, specifying when waterfront lands are or are not

10

vested with riparian rights, and delineating the rights conferred to riparian owners. These cases provide analogous authority to establish whether a particular parcel of land is vested with littoral rights and, if so, what uses the owner is entitled to make of his land. *See Coastal Indus. Water Auth. v. York*, 532 S.W.2d 949, 952 (Tex. 1976) (discussing rules with equal application to riparian and littoral land).

### Is the Cumminses' land vested with littoral rights?

The Cumminses claim that they have littoral rights attached to their land based merely on its proximity to the waters of Lake Travis. The District conclusively established, however, that the Cumminses' land is not vested with littoral rights because their title cannot be traced back to a grant from the sovereign between 1823-1895 and because their land is not appurtenant to a natural lake with a normal flow of water.

For a landowner to establish that his land is riparian or littoral, the land must have certain characteristics. First, the landowner must be able to trace his chain of title back to a grant from the sovereign between 1823 and 1895. Tex. Water Code Ann. § 11.001(b) (West 2000) ("The code does not recognize any riparian right in the owner of any land the title to which passed out of the State of Texas after July 1, 1895."); *In re Adjudication of Water Rights in Llano River Watershed,* 642 S.W.2d 446, 447-48 (Tex. 1982) (no riparian rights in portions of land granted from State after 1895, but owner did have riparian rights in other portions of land granted before 1895); *In re Adjudication of Water Rights of Upper Guadalupe Segment*, 642 S.W.2d 438, 444 (Tex. 1982) (land vested with riparian rights if granted from sovereign prior to July 1, 1895); *Watkins Land Co. v. Clements*, 86 S.W. 733, 735 (Tex. 1905). Land granted from the Mexican or Spanish governments

11

between 1823-1840 was vested with civil law riparian rights. *In re Adjudication of Water Rights of Brazos III Segment*, 746 S.W.2d 207, 209 (Tex. 1988); *see also Norrell*, 1 S.W.3d at 298 n.1 (land with title traceable back to Mexican grant had littoral rights attached); *City of Port Isabel*, 729 S.W.2d at 942 (same). In 1840, Texas adopted the English common law riparian system. *Motl v. Boyd*, 286 S.W. 458, 465-66 (Tex. 1926); *Skillern I*, at 29. The State continued to recognize common law riparian rights in land granted from the sovereign until 1913, when Texas passed an amended version of the Irrigation Act, which "ceased to recognize riparian rights that were not already vested and prohibited their creation by state land patents issued after July 1, 1895. That provision of the 1913 act remains part of the Texas Water Code today." *Skillern I*, at 29 (Irrigation Act resulted in dual system because it protected prior riparian rights while enforcing appropriation system). Therefore, unless a landowner can trace his chain of title to a grant from the Mexican or Spanish governments between 1823-1840, or to a grant from the State of Texas between 1840-1895, he cannot establish that his land is vested with riparian or littoral rights. *Id*. at 62.

Furthermore, in an attempt to alleviate the complications resulting from its dual system, in 1967 Texas passed the Water Rights Adjudication Act, which required a Texas landowner claiming a right to use the water to file a sworn statement, participate in an evidentiary hearing, and obtain a certificate of adjudication. Tex. Water Code Ann. §§ 11.301-.341 (West 2000 & Supp. 2004-05); *Skillern I*, at 48. With narrow exceptions for domestic and livestock uses, any person who failed to timely file a claim with the Commission was deemed to have abandoned or waived his right to use the water, whether the nature of his claim was riparian or appropriation. *In re Adjudication of Water Rights of Upper Guadalupe Segment*, 642 S.W.2d at 442; *see also* Tex. Water Code Ann.

12

§ 11.307 (West 2000) (claim must be filed within time prescribed by notice of adjudication).  The Water Rights Adjudication Act is now the "exclusive means by which [water] rights may be recognized" and, in absence of a certificate of adjudication, Texas courts do not have the power to "grant in equity certain water rights not otherwise recognized by law." *In re Adjudication of Water Rights of Brazos III Segment*, 746 S.W.2d at 210; *see generally* Hans W. Baade, *The Historical Background of Texas Water Law—A Tribute to Jack Pope*, 18 St. Mary's L. J. 1 (1986).

Assuming the landowner can establish a proper chain of title and/or certificate of adjudication, there are also physical attributes that must be present in order for the land to be considered riparian or littoral.  Most clearly, the land must be adjacent to the water.  *Richter*, 174 S.W. at 286 ("riparian rights depend upon the ownership of land which is contiguous to and touches upon the water"); *Watkins Land Co.*, 86 S.W. at 735; *Hutchins*, at 330-32 ("loss of contact with the stream brings loss of riparian rights").  Additionally, the adjacent water must be a "natural," not an "artificial," body.  *Arseneaux*, 297 S.W. at 229 (water must travel along the normal course of migration and come to rest in a basin made by nature for the purpose of holding water); *see also In re Adjudication of Water Rights of Brazos III Segment*, 746 S.W.2d at 210; *Harrell v. Vahlsing, Inc.*, 248 S.W.2d 762 (Tex. Civ. App.—San Antonio 1961, writ ref'd n.r.e.) (riparian rights do not attach to artificial bodies of water; one only has rights to use such water if by grant or prescription).  Finally, riparian or littoral rights only attach to the "normal flow" of the waters, as opposed to "floodwaters."  *Motl*, 286 S.W. at 470; *Roberson v. Red Bluff Water Power Control Dist.*, 142 S.W.2d 248, 254 (Tex. Civ. App.—El Paso 1940, no writ) (waters impounded by dam are

13

floodwaters and, hence, do not confer riparian rights); *see* Ira P. Hildebrand, *Rights of Riparian Owners*, 6 Tex. L. Rev. 19, 37 (1927) (discussing lack of riparian rights in flood waters).

In sum, for a lakefront property owner to establish that his land is vested with littoral rights, he must (1) be able to trace his title back to a grant from the sovereign between 1823-1895 and/or present a certificate of adjudication from the State, and (2) establish that his land, as granted in the deed, borders a natural lake with a "normal flow" of water.

The Cumminses do not dispute that their chain of title originated with a grant from the State of Texas in 1904; their expert land surveyor testified to this in his affidavit. Without addressing the fact that Texas ceased recognizing common law riparian rights in grants of waterfront property from the sovereign after 1895, the Cumminses claim only that, because the 1904 grant mentions "the meanders of the Colorado River" in its property description, they have riparian or littoral rights based on their ownership of land that has "lateral contact with the water." That the Cumminses cannot trace their title back to a grant from the sovereign prior to 1895 is sufficient to establish that their land is not vested with littoral rights.[6] *See Watkins Land Co.*, 86 S.W. at 735. In the alternative, however, the District established that the Cumminses are not littoral owners because their chain of title did not convey land appurtenant to a natural lake.[7]

---

[6] In its brief, the LCRA contended that, "[b]ecause the Cummins' deeds deraign title from the sovereign after 1895, the common law rights they claim in this case—whether they are designated as riparian or littoral—do not exist as to the property in question. This historical fact alone should be dispositive of any claims they may make to a riparian right, unless they can show a permit from the State for a water right in the waters of Lake Travis."

[7] Neither party addressed what impact the Water Rights Adjudication Act has on the Cumminses' claim and nothing in the record demonstrates that the Cumminses or their predecessors obtained a certificate of adjudication entitling them to water rights. The Texas Supreme Court has clearly stated that the Act is the "exclusive means by which [water] rights may be recognized" and,

The Cumminses' chain of title began with a 1904 grant of land from the State to Leonard Eck, who then conveyed the land to Oscar Collier in 1927. The 1927 deed used the "bank of Colorado River" and "down said river with its meanders" to describe the land's boundaries. Construction of the Marshall Ford Dam (now Mansfield Dam) began in 1937; after the erection of the dam, the relevant portion of the Colorado River was transformed into Marshall Ford Lake (now Lake Travis), which is an artificial lake specifically designed to contain floodwaters. Based on these changes to the body of water affronting Collier's land, when he transferred this parcel to the Cherico family in 1938, the perimeter was described as the "water level line of Marshall Ford Lake." This same description was used in later deeds from the Chericos to the Bradfield/Brush families in 1943 and from Bradfields/Brushes to Nell Bradfield in 1948. The land was eventually conveyed to Betty Ann Bradfield Cummins in 1975 from Nell Bradfield, her mother; the grant referenced the 1948 deed for a description of the land.[8]

Although the Cumminses' chain of title references the waterline as a boundary, it does not establish that the Cumminses' land is vested with littoral rights because—in addition to the fact that their title failed to originate prior to 1895—the adjacent water referenced in the deeds is an artificial lake, rather than a natural body of water, and the waters filling that lake are not considered its "normal flow," but are instead floodwaters. *See Arseneaux*, 297 S.W. at 229 (riparian or littoral

---

in the absence of a certificate of adjudication, Texas courts do not have the power to "grant in equity certain water rights not otherwise recognized by law." *In re Adjudication of Water Rights of Brazos III Segment*, 746 S.W.2d 207, 210 (Tex. 1988).

[8] Nell Bradfield also granted Betty Cummins a 9.354 acre tract that she had acquired from Charles A. McCormick in 1945. Although the 1975 grant describes this land as "lying south" of the tract conveyed from the Chericos to the Bradfield/Bush families, nothing else in the record provides a description of this land.

rights only attach to natural bodies of water); *Motl*, 286 S.W. at 740 (no riparian rights in floodwaters); *Roberson,* 142 S.W.2d at 249, 254 (construction of dam across natural river resulted in creation of artificial lake, and waters impounded by dam are floodwaters). Even though the 1927 deed from Eck to Collier used the Colorado River as a boundary description, this does not mean that the Cumminses' subsequent deed granted land adjacent to a natural body of water. *See Watkins Land Co.*, 86 S.W. at 735 (land must be "continuously riparian" since the time it was granted by the sovereign); *Hutchins*, at 330 ("loss of contact with the stream brings loss of riparian rights"). Following the 1927 deed, the water was transformed from a natural to an artificial body as the result of a man-made dam. At the time of the grants from the Chericos in 1938, from the Bradfields/Brushes in 1948, and from Nell Bradfield to Mrs. Cummins in 1975, the waters abutting the Cumminses' property comprised the Marshall Ford Lake/Lake Travis, not the Colorado River. Given that the Cumminses cannot trace their title back to a grant from the sovereign between 1823-1895, and that the Cumminses' grant only references an artificial body of water, the Cumminses' land is not vested with littoral rights.

Our holding applies to all six lots of the Cumminses' land because it is based on the chain of title, which is the same for the entire property, given that the Cumminses obtained the land as one parcel and later subdivided it into six lots. Thus, the Cumminses' second issue, claiming that they have littoral rights in all six lots, is overruled, and we do not reach their fourth issue, asserting in the alternative that they have littoral rights in Lots 1-5.[9]

---

[9] The Cumminses based this alternative argument on a boundary agreement, executed between themselves and the District, pertaining to the boundary lines of Lot 6. They asserted that even if this agreement eliminated their littoral rights in Lot 6, they maintained littoral rights in the

***Are the Cumminses entitled to construct a boat dock?***

Although the Cumminses generally asserted on appeal that they have littoral rights to "use their land as waterfront property," their claims at the declaratory judgment and summary judgment phases were more specific. In response to the District's denial of their application for a boat dock license, the Cumminses initially urged that they had littoral rights entitling them "to construct docks and other improvements." The District, therefore, sought and obtained summary judgment on the basis that the Cumminses have no property right entitling them to construct a boat dock on the submerged lands that are held by the State in trust for the public and are validly regulated by the water control and improvement district, as an agent of the State, for the purpose of providing safe drinking water to the public.

*(1)  Uses littoral owners are entitled to make of the water*

It is well established that riparian and littoral owners merely have a privilege to use and enjoy the water flowing next to their land and do not have any possessory interest in the water. *Skillern I*, at 29. The right to use the water has been "termed a simple usufruct in the water as it passes along." *Hutchins*, at 302; *see also In re Adjudication of Water Rights of Upper Guadalupe Segment,* 642 S.W.2d at 444. The rights to use and enjoy the adjacent water are primarily for natural purposes, such as the "right of access" and "for the support of human and animal life and to answer the demands of other domestic uses"; these are preferred over uses of the water for irrigation and

___

other five lots. Because our analysis concludes that, regardless of the boundary agreement, the Cumminses have no littoral rights in any of their land based on the chain of title, we need not consider this alternative claim.

manufacturing. *Hollan v. State*, 308 S.W.2d 122, 125 (Tex. Civ. App.—Fort Worth 1957, writ ref'd n.r.e.) (right of access); *Watkins Land Co.*, 86 S.W. at 735 (domestic uses preferred); *see also State v. Valmont Plantations*, 346 S.W.2d 858, 855 (Tex. Civ. App.—San Antonio 1961), *aff'd,* 355 S.W.2d 502 (Tex. 1962) (traditional rights conferred to riparian or littoral owners include use of water for drinking, fishing, navigation, travel, and domestic purposes). Although a littoral or riparian owner may be able to establish rights to use the water for recreational purposes, the legislature has determined that these uses are not preferred when the water is regulated by a water district. Tex. Water Code Ann. § 51.184 (West 2000) (uses of district water listed in order of preference, with use for "pleasure and recreation" appearing last).

It is also well established that riparian or littoral uses must be "reasonable." *Motl*, 286 S.W. at 470. Riparian or littoral owners must not exercise their rights in a manner that is detrimental to other, correlative owners or to the public generally. *Watkins Land Co.*, 86 S.W. at 735. To ensure that water rights are exercised in a reasonable manner, riparian and littoral owners are subject to the State's police powers, and any uses of the water must be done in accordance with the valid regulations of the governing authority. *See Ulbricht v. Friedsam*, 325 S.W.2d 669, 673 (Tex. 1959). Moreover, "courts have ample authority to . . . regulate the manner of using the water." *Watkins Land Co.*, 86 S.W. at 736. Even if the Cumminses had littoral rights in their land, they would not be entitled to construct a private, recreational boat dock because that would not be a "reasonable use" of water regulated by a water control and improvement district.

The Cumminses cite *City of Corpus Christi v. Davis* for the proposition that littoral rights include the "right to build wharves, docks, and piers." 622 S.W.2d at 646. In *Davis* the court

held that the landowners had a right to cultivate an oyster bed, and the statement regarding docks and piers was *dicta*. The majority of cases do not include the right to build boat docks as a littoral or riparian right. *See*, *e.g.*, *Shively v. Bowlby*, 152 U.S. 1, 14 (1984) (waterfront property owners have no title in adjacent submerged lands and no right to build upon those lands). Furthermore, any such rights an owner may have can only be exercised in a reasonable fashion and are subject to the State's police powers. *Ulbricht*, 325 S.W.2d at 673. *Davis* does not support the claim that an owner of non-littoral land adjacent to a water district is entitled to construct a boat dock in violation of a water district's regulations, which protect the public's interest in safe drinking water.

*(2) Littoral boundaries and the public trust doctrine*

The District also established that, regardless of the littoral rights issue, it properly denied the Cumminses' application for a boat dock license on the basis that the Cumminses have no rights in the submerged lands of Lake Travis: the Cumminses' boundary line is the water's edge; the State holds title to the land and waters beyond that in trust for the public; and, in accordance with its duties to conserve and maintain those natural resources, the State has authorized the District to regulate, treat, and improve that water for the public.[10]

---

[10] Aside from the well-established law that waterfront property owners only take title to the water's edge while the State maintains ownership of the submerged lands and waters as trustee for the public, *Maufrais v. State*, 180 S.W.2d 144, 148 (Tex. 1944), the parties further dispute the Cumminses' boundary line based on the Cumminses' chain of title and a boundary agreement executed between the parties in 1999. The District argues that these documents establish that the Cumminses do not own and, hence, have no rights to use the land beyond the 670-foot contour line. The Cumminses assert that the exact boundary line is immaterial; they claim that (1) they have littoral rights and (2) the boundary agreement did not alter this fact.

19

As with all navigable bodies of water within Texas, the State owns the beds and waters of Lake Travis: "The water of the ordinary flow, underflow, and tides of every flowing river, natural stream, and lake, and of every bay or arm of the Gulf of Mexico, and the storm water, floodwater, and rainwater of every river, natural stream, canyon, ravine, depression, and watershed in the state is the property of the state." Tex. Water Code Ann. § 11.021(a) (West 2000); *see also* Frank F. Skillern, II Texas Water Law, at 128 (1991) (hereinafter *Skillern II*). According to the supreme court, the "rule has long been established" in this State that "the State is the owner of the soil underlying the navigable waters, such as navigable streams, as defined by statute, lakes, bays, inlets, and other areas withing the tide water limits within its borders." *City of Galveston v. Mann*, 143 S.W.2d 1028, 1033 (Tex. 1940). Given that the State holds title to the beds and waters of all navigable bodies, the boundaries of adjacent lands necessarily end at the water's edge. *Maufrais v. State*, 180 S.W.2d 144, 148 (Tex. 1944) (even if adjacent land is riparian, ownership ends at the banks, and State owns underlying soil); *Welder*, 196 S.W. at 870, 872 (deed using waterline to describe boundary only grants to water's edge, not to middle of body, and State maintains title to lake beds and waters); *City of Port Isabel*, 729 S.W.2d at 942 (as shoreline adjusts over time, so does landowner's boundary; wherever location of shoreline is at any given time represents boundary of

---

We have already addressed that the Cumminses' land is not vested with littoral rights because their chain of title cannot be traced to a grant from the sovereign before 1895 and because their grant did not convey land adjacent to a natural body of water. Given this, and that the law establishes that the Cumminses have no rights to build permanent structures on state-owned trust property, we need not determine the precise boundaries of the Cumminses' property. *See City of Port Isabel v. Missouri Pac. R.R. Co.*, 729 S.W.2d 939, 942 (Tex. App.—Corpus Christi 1987, writ ref'd n.r.e.) (boundary between private land and public water adjusts over time; wherever shoreline is at any given time represents boundary because State always holds title to submerged lands and public waters).

land). The owners of land abutting a navigable body of water do "not [have] a title in the soil below high water mark, nor a right to build thereon, but a right of access only, analogous to that of an abutter upon a highway." *Shively,* 152 U.S. at 14.

The purpose of the State maintaining title to the beds and waters of all navigable bodies is to protect the public's interest in those scarce natural resources. *See Hall*, 57 S.W. at 565. "From its earliest history this State has announced its public policy that lands underlying navigable waters are held in trust by the State for the use and benefit of all the people." *State v. Bradford*, 50 S.W.2d 1065, 1069 (Tex. 1932) (navigable waters include lake waters); *see also* Tex. Water Code Ann. § 11.021(a) (State holds title to lake waters in trust for public). The importance of the State's duty to protect its natural resources is demonstrated by article 16, section 59 of the Texas Constitution, which provides that "[t]he conservation and development of all of the natural resources of this State, . . . and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties." Tex. Const. art. XVI, § 59; *see also Barshop*, 925 S.W.2d at 623 ("[c]onservation of water has always been a paramount concern in Texas"); *In re Adjudication of Water Rights of Upper Guadalupe Segment,* 642 S.W.2d at 445 (State has constitutional duty to conserve water as a precious resource).

Based on the fact that the State owns the water and submerged lands over which the Cumminses sought to construct a private, recreational boat dock, the District was authorized to deny the Cumminses' application for a license. In *City of Galveston v. Mann*, the supreme court held that the City was not entitled to construct a boat dock in the Gulf of Mexico because it would encroach on the submerged lands, which were State property. 143 S.W.2d at 1034 (The erection of the dock

21

"would be an encroachment, at the least, upon the prima facie property rights of the sovereign. . . . Such a structure in legal phraseology would constitute a purpresture," whether it would "obstruct navigation or otherwise.").

The District's denial of the license is further justified by the fact that the State, as trustee, is entitled to regulate those waters and submerged lands to protect its citizens' health and safety and to conserve its natural resources. *Goldsmith & Powell v. State*, 159 S.W.2d 534, 535 (Tex. Civ. App.—Dallas 1942, writ ref'd) (State can take action to prevent pollution of trust resources). Even if waterfront land is privately owned, it is still subject to regulation under the State's police powers. *Parker v. El Paso Water Improvement Dist. No. 1*, 297 S.W. 737, 740-42 (Tex. 1927). The rights of individual landowners "must yield . . . or be modified by . . . what is declared upon the whole to be for the public benefit," especially when the regulation affecting the owner's property is "essential or material for the prosperity of the community," and is one "in which all of the landowners have to a certain extent a common interest," and that "cannot be accomplished without the concurrence of all or nearly all of [the adjacent land] owners by reason of the peculiar natural condition of the tract." *Id.* at 742 (owners must exercise rights in accordance with regulations of water district).

The State has enacted several provisions of the water and administrative codes to accomplish its duties as trustee for the public,[11] and has statutorily established various water districts to act as its agents in regulating portions of state-owned natural resources and trust properties. The

---

[11] *See*, *e.g.*, Tex. Water Code Ann. §§ 1.003 (West 2000) (public policy of State to conserve natural resources), 26.023 (Commission to set and enforce water quality standards) (West 2000); 30 Tex. Admin. Code §§ 307.1-.10 (2004) (Texas Surface Water Quality Standards).

22

water code grants districts all the "functions, powers, authority, rights and duties that will permit accomplishment of the purposes for which it was created or the purposes authorized by the constitution, this code, or any other law." Tex. Water Code Ann. § 49.211(a) (West Supp. 2004-05). This includes the power to "adopt and enforce reasonable rules and regulations to . . . preserve the sanitary condition of all water controlled by the district" and to accomplish its purposes "by any practical means." *Id*. §§ 51.121, .122, .127 (West 2000 & Supp. 2004-05). Specifically, the Texas Administrative Code mandates that water control and improvement districts install raw water intakes to secure water of the "best quality available." 30 Tex. Admin. Code § 290.41(e)(2). The code specifies that the "intakes shall not be located within 1,000 feet of boat launching ramps, marinas, [or] docks . . . accessible by the public" and that "all recreational activities" shall not occur within a 200-foot "restricted zone" around the intake. *Id*. Such districts are expressly given the authority to enact "[r]egulations governing this zone" and provisions "for the strict enforcement of such ordinances and regulations." *Id*. Pursuant to the water and administrative codes, the Travis County Water Control and Improvement District No. 17 enacted Regulation 6.5.3.2 to prohibit "[a]ll activity not related to the maintenance of the barge or intake . . . within 200 feet" and "[a]ll recreational boating activity within 1000 feet." Reg. 6.5.3.2.

These regulations ensure an adequate supply of safe drinking water for the public; as in *Parker*, they benefit the entire community, in which the individual property owner shares a common interest, and they require cooperation of all adjacent owners in order to function properly. *See* 297 S.W. at 742. The Cumminses, just as all members of the surrounding community, benefit from the District's production of safe drinking water, and the record does not disclose that these

23

regulations are being enforced against the Cumminses any differently than they are against any other user of Lake Travis. The regulations establishing a 200-foot clear zone and preventing recreational boating activity within 1000-feet of the intake barge apply equally to all persons. The Cumminses' ownership of waterfront property is subject to regulation under the State's police powers and, hence, their rights must yield to the regulations that serve the public's interest in protecting trust property. *See id.*

The District, therefore, established that it was authorized to deny the Cumminses' application for a boat dock license on multiple grounds. First, based on their chain of title, the Cumminses' property is not vested with littoral rights and, even if it were, littoral rights do not entitle an owner to construct recreational boat docks. Second, the Cumminses have no rights to construct a boat dock in the desired location because those waters and submerged lands are state-owned trust property and are regulated by a water control and improvement district for the purpose of providing safe drinking water to the public.

**Easement and Quasi-Easement**

In their fifth issue, the Cumminses assert as an alternative argument that, even if they do not have littoral rights to make use of their land "as waterfront property," they possess an easement or quasi-easement entitling them to do so.[12] The Cumminses base this claim on language

---

[12] In their petition for declaratory judgment, the Cumminses specifically asserted that they had an easement conferring "the right to build, construct, and maintain on their lakefront land at all times such buildings, structures and facilities as are useful and appropriate for lake-front property." Accordingly, the District sought and obtained summary judgment on the basis that the Cumminses "do not have an easement or quasi-easement which would allow them to build or locate a boat dock at or below the 670-foot contour line."

in their chain of title and testimony in their affidavits; they urge that these documents establish that the grantors intended the land to be used as waterfront property and that the property has historically been used for boating, fishing, and swimming. The District contends that the Cumminses' deeds failed to reserve an express easement and that the Cumminses have not demonstrated a continuous and necessary use of the land for recreational boating in order to support an implied easement.

An express easement is an interest in land to which the statute of frauds applies. *West Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 264 (Tex. App.—Austin 2002, no pet.). For the statute of frauds to be satisfied, the intent of the parties, the essential terms of the easement, and an adequate description of the easement's location must be apparent from the face of the document, without reference to extrinsic evidence. *Id*. at 265. If the court cannot determine these elements with reasonable certainty, then no express easement is conveyed. *Id*. at 264. An easement's express terms, which are to be given their plain meaning, define the purposes for which the easement holder may use the property. *Marcus Cable Assocs. v. Krohn*, 90 S.W.3d 697, 701 (Tex. 2002); *Coleman v. Forister*, 514 S.W.2d 899, 903 (Tex. 1974). The easement holder is only entitled to do what is "reasonably necessary" to fairly enjoy the rights that were expressly granted, and if a purpose was not expressly provided for in the grant, it is not permitted. *Krohn,* 90 S.W.3d at 701. This is because an easement is a nonpossessory interest, allowing its owner to use the land only for specified purposes, rather than a possessory interest, which would allow its owner to make any use of the property. *Id*. at 702.

As support for their claim of an express easement, the Cumminses rely on a deed dated July 20, 1940, executed from the Collier family to the LCRA. The deed granted the LCRA

25

"a perpetual easement and right to inundate, submerge and overflow all of our certain tracts of land [lying between the 670 foot contour elevation and the 715 foot contour elevation] . . . by virtue of the construction, erection, maintenance, and operation of a dam. . . ." The deed also included an express reservation of rights for the Colliers and their assignees by stating that it was

> executed upon condition that the grantors herein, their heirs and assigns, shall have free access at all times to the lake of water formed by the Marshall Ford dam . . . and the right to use the water from said lake . . . for domestic purposes and shall have the right to go upon, pass over and across any and all parts of the land conveyed herein as a means of ingress and egress to the water of said lake. . . .

The language of this reservation reserves only basic rights to access the water, for domestic use, and for ingress and egress. Those rights, as with all water rights, must be exercised reasonably—in a manner that does not harm other waterfront owners or the general public—and in accordance with the State's police power regulations. *Ulbricht,* 325 S.W.2d at 673; *Watkins Land Co.*, 86 S.W. at 735. Beyond those basic rights, this reservation does not expressly provide a right to use the land submerged at or beyond the 670-foot contour line for recreational purposes, nor the right to build and maintain structures on that land. Mooring a boat dock on the land at issue is not "reasonably necessary" in order to achieve the rights that were expressly granted.

Regardless of what rights this reservation conveys, the District contends that the Cumminses are not entitled to any of them because the Collier's reservation was not transferred through the Cumminses' chain of title. Prior to executing the 1940 deed, on February 23, 1938, the Colliers transferred part of their land to the Chericos. Although the 1938 transfer described the lake's "water level line" as a boundary, it did not grant the Chericos any express rights to use or

26

access the water. The Cherico tract was later transferred to the Bradfield and Brush families, and then to Nell Bradfield, from whom Betty Ann Bradfield Cummins inherited the land in 1975. When the Colliers executed the 1940 deed to the LCRA, they specifically excluded from its terms "certain small tracts of lots which were sold by grantors . . . prior to May 28, 1940," such as the Cherico tract. Because the Cherico tract—which eventually became the Cumminses' property—was out of the Colliers' possession at the time the Colliers reserved their specific water rights, and because the Colliers expressly stated that their reservation of rights did not apply to previously sold tracts, the 1940 deed does not provide any evidence of an express easement for the Cumminses to "use their land as waterfront property," or to moor a boat dock on the District's land. Furthermore, the 1938 Cherico deed, as well as subsequent transfers from the Chericos to the Bradfields and Cumminses, did not expressly confer such an easement to the Cumminses. Thus, the District conclusively established the lack of an express easement.

In the absence of an express easement, the Cumminses alternatively claim that they possess an implied easement. To demonstrate the existence of an implied easement, they must show that the land has been apparently, continuously, and necessarily used for the desired purpose. *Drye v. Eagle Rock Ranch, Inc.,* 364 S.W.2d 196, 207 (Tex. 1963). These phrases carry precise legal meanings: "apparent" means that the use must have existed at the time of the grant, "continuous" denotes conspicuousness and permanency, and "necessary" refers to uses that are essential for the easement owner to make proper use of his land. *Id*. at 207-08. Typically, implied easements are only recognized for economic or physical necessities, and not for uses that are merely desirable or recreational. *Id*. at 208. Finally, no easement will be implied if its purpose would be against public

27

policy. *Carrithers v. Terramar Beach Cmty. Improvement Ass'n*, 645 S.W.2d 772, 774 (Tex. 1983) (easement over submerged land in Gulf of Mexico not implied because it conflicted with public policy of State having sole control over those waters and submerged lands, held in trust for public).

As support for their implied easement claim, the Cumminses point to the 1940 Collier reservation of rights and to Betty Ann Bradfield Cummins's affidavit. Because the rights reserved by the Colliers did not transfer through the Cumminses' chain of title, the 1940 deed does not support the Cumminses' claim. Further, the District challenged Mrs. Cummins's affidavit—which stated that her "family has had boats and boat docks in years past in the water adjacent to the property and we have fished in the water and used it for swimming"—by urging that no boat dock has been moored on the submerged land during the thirty years in which that area has been subject to the District's regulation and that, given the indefinite nature of Mrs. Cummins's statements, her affidavit failed to establish a genuine issue of material fact. Even in the face of this challenge, the Cumminses offered no probative evidence of their claim that boat docks had previously existed on the property. The trial court's duty is to determine if any genuine issues of material fact remain, not to weigh the evidence or determine its credibility. *Trison Inv. Co. v. Woodard*, 838 S.W.2d 790, 792 (Tex. App.—Dallas 1992, writ denied). Mrs. Cummins's statements lacked specificity and were not sufficient to raise a genuine issue of material fact as to whether the Cumminses' property has been apparently, continuously, and necessarily used for the purpose of a recreational boat dock. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004); *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996).

The Cumminses also rely on *Ulbricht v. Friedsam* for the notion that an easement should be implied on their behalf "for access to and continued use of the water." 325 S.W.2d at 676-77. In *Ulbricht*, the property owners sought an implied easement to access the waters of Lake Buchanan, to allow their cattle to graze along the shoreline, and for the right to construct structures, which would be moored on the submerged lands regulated by the LCRA below the 1020-foot contour line, in order to fully enjoy their land as lakefront property. *Id*. at 675. The court took judicial notice of the necessity in allowing livestock to access water and noted that neighboring property owners had continuously made apparent use of their land for boat docks and recreation, without objection from the LCRA. *Id*. The court then recognized an implied easement for the property owners to access the water, to graze their cattle, and to use and enjoy the land below the 1020-foot contour line, limited to the extent that the uses were reasonable and necessary, and subject to the rights of the LCRA. *Id*. at 677.

*Ulbricht* does not support the Cumminses' position for two reasons. First, in *Ulbricht* there was an established use of the land for boat docks and recreational activity, and the LCRA, which owned the submerged land, had allowed this use to continue for an extended time period. Here, the District denied the Cumminses' application for a license to build a boat dock and has not allowed a recreational boat dock to be moored within the regulated zones of its water treatment facility. Second, the *Ulbricht* court, even in implying the easement, recognized that the LCRA had superior rights to regulate the submerged land. Based on this and the fact that an easement shall not be implied when its purpose would contravene public policy, there can be no implied easement for the Cumminses to moor a recreational boat dock in the land, which is owned by the State and

29

regulated by the District for the purpose of providing safe water to the public. At most, *Ulbricht* supports the Cumminses' claim that they have basic rights to use and access the water. However, since all uses of water must be conducted in a reasonable manner and in accordance with police power regulations, the Cumminses are not entitled to act in any manner contrary to the District's regulations that would cause harm to the public's supply of safe drinking water. *See id.* at 673; *Watkins Land Co.*, 86 S.W. at 735.

Because the District negated that any genuine issues of material fact remain about the existence of either an express or an implied easement, the Cumminses' fifth issue is overruled.

### Inverse Condemnation

The Cumminses assert in their first issue that they have suffered an inverse condemnation—a taking for which they are entitled to be compensated—pursuant to either the United States Constitution or the Texas Constitution. *See* U.S. Const. amend V; Tex. Const. art. I, § 17. The Cumminses claim that the District's regulation prohibiting "[a]ll activity not related to the maintenance of the barge or intake" within 200 feet of the intake barge constitutes a *per se* taking of the portion of their land that falls within the 200-foot radius, which is, essentially, the shoreline of Lot 6. Alternatively, the Cumminses claim that the 200-foot regulation constitutes a case-specific taking of "their land, not [limited to] any particular lot." The Cumminses additionally claim to have suffered a *per se* taking of their property based on the District's requirement that warning signs be placed along the shoreline; this argument, too, is made in terms of their entire parcel of land. The District counters that no taking has occurred and that, aside from the denial of the boat dock license, the Cumminses have failed to present a ripe takings claim.

30

"[N]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made . . . .," Tex. Const. art. I, § 17, "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. A property owner can establish a taking with evidence that a governmental regulation has detrimentally impacted the use of his land; this is considered an inverse condemnation. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998).

The basic test is whether the regulation "goes too far" in restricting the permissible uses of the property or in decreasing its value. *Sheffield Dev. v. City of Glenn Heights*, 140 S.W.3d 660, 670 (Tex. 2004). If the regulation denies the owner "all economically beneficial or productive use of [the] land," leaving him with only "a token interest," or if the regulation results in a "physical invasion" of private property, then it may be considered a *per se* taking. *Id*.; *see also Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1016 (1992). Otherwise, the court must engage in a case-specific analysis of whether a taking has occurred, as guided by the *Penn Central* factors: (1) "the economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978); *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 631 (2001) ("these factors do not comprise a formulaic test").

Whether the landowner claims a *per se* or a case-specific taking, our inquiry can be divided into two basic parts: first, whether the regulation constitutes a taking and, if so, what economic impact results from that taking. *City of Austin v. Travis County Landfill Co.*, 73 S.W.3d 234, 241 (Tex. 2002). The court cannot analyze the economic-impact prong without first answering

31

the ultimate question of whether the regulation has substantially interfered with the landowner's use and enjoyment of the property. *Id*. To establish this, a landowner must put forth specific evidence of a direct, immediate, and substantial impact that the regulation has had on the land, making it unusable for its intended purposes. *Id.* at 240. The landowner must "quantify the risks and the hazards or specifically describe how the [regulation] interfered" with the use and enjoyment of the land; "nonspecific allegations [that the regulation resulted in increased costs and risks on the land] are not enough to establish a taking." *Id*. at 243. An "essential prerequisite" to a regulatory takings claim is a "final and authoritative determination of the type and intensity of development legally permitted on the subject property. A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *City of El Paso v. Madero Dev. & Constr. Co.*, 803 S.W.2d 396, 400 (Tex. App.—El Paso 1991, writ denied). This question "cannot be disposed of by general propositions." *Id*.

Not every regulation of private land constitutes a compensable taking. *Travis County Landfill Co.*, 73 S.W.3d at 242. Compensation is not required if the property owner's loss is occasioned by the proper exercise of police power. *Lombardo v. City of Dallas*, 73 S.W.2d 475, 478-79 (Tex. 1934). The "contemporary understanding" is that the government has a "broad realm" in which it "may regulate without compensation." *Lucas*, 505 U.S. at 1024. Although there is "no bright line rule" for establishing when an exercise of police power is proper—and hence, not a taking—there are two related factors to be considered in analyzing this question of law. *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804 (Tex. 1984). A police power regulation does not constitute a taking if (1) it is adopted to accomplish a legitimate goal that is "substantially

related" to the health, safety, or general welfare of the people, and (2) it is reasonable, not arbitrary. *Id.*; *see also Skillern II*, at 170 (regulation supporting conservation of natural resources, such as water held for public trust, "is not a 'taking' within the proscription of the 5th and 14th amendments"). The theory underlying this rule is that it would not be logical to compensate a private owner for the impact a regulation has on his land where the owner, as a member of the general public, also benefits from the regulation. *Rayburn*, § 2.00, at 2. Furthermore, to require the State to compensate a private property owner each time a regulation, which was enacted for the public good, "curtail[ed] some potential for the use or economic exploitation of private property . . . would effectively compel the government to regulate by purchase." *Estate of Scott v. Victoria County*, 778 S.W.2d 585, 590 (Tex. App.—Corpus Christi 1989, no writ) (emphasis omitted).

### The 200-foot regulation

The Cumminses first challenge the District's 200-foot regulation on the basis that it constitutes a *per se* taking of "the portion of [their] property within 200 feet of the intake [barge]." They claim that, because the regulation prohibits "all activity" within a 200-foot radius, it deprives them of all of their property rights in that land and prevents them from making any economically beneficial or productive use of it. Alternatively, the Cumminses claim that the regulation has had a detrimental economic impact on their land and has interfered with their investment-backed expectations, therefore entitling them to compensation under a case-specific takings analysis. The District conclusively established that its 200-foot regulation does not constitute a taking of the Cumminses' property—pursuant to either a *per se* or a case-specific analysis—because it has not

substantially interfered with the Cumminses' use and enjoyment of their land and because it is a legitimate exercise of the State's police power.

Regarding either the specific portion of land encompassed by the 200-foot regulation or their parcel as a whole, the Cumminses have not demonstrated any particular activity or land use that has been "substantially interfered" with as a result of the District's 200-foot regulation. *See Travis County Landfill Co.*, 73 S.W.3d at 241, 243 (specific allegations of direct, immediate, and substantial impact required to establish regulatory taking). The Cumminses only assert that the regulation prevents "all activity" on the land, which could "*presumably* includ[e] walking on it or using it in any way." (Emphasis added.) The Cumminses have not alleged that the District has actually prohibited them from doing anything on their land in its entirety or within the 200-foot zone.[13] *See Madero Dev. & Constr. Co.*, 803 S.W.2d at 400 (court cannot determine if regulation goes "too far" without final and authoritative determination of restricted activity).

The Cumminses' argument—that a taking has occurred because "presumably all activity" could be prevented by the regulation—not only employs a hypertechnical reading, it also is forward-looking and does not provide sufficient evidence of a ripe controversy. *See Barshop*, 925

---

[13] The Cumminses agreed at oral argument that the only activity they have been prohibited from doing is constructing a boat dock over the waters and submerged lands of Lake Travis; this issue is ripe based on the District's denial of the Cumminses' desired boat-dock license. On appeal, however, the Cumminses failed to assert the denial of their license as a basis to support their takings claim. In any event, the denial does not constitute a taking of the Cumminses' land because the activity prohibited would have occurred on property that is held by the State in trust for the public, to which the Cumminses have no rights, and because the regulation, which ensures an adequate supply of safe drinking water for the public, is a legitimate exercise of police power. *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804 (Tex. 1984) (regulation not a taking if it is reasonable and substantially related to protecting health, safety, or general welfare).

S.W.2d at 629 (courts are to presume constitutionality of regulations and avoid overly literal constructions); *City of El Paso*, 803 S.W.2d at 400 (ripeness). Furthermore, the assertion that "all activity" on their land has been prohibited is contrary to the District's repeated statements, made in public records,[14] that it "is only prohibiting the Cummins family from mooring or building a boat dock on District property below 670 feet and is only regulating boating activity within a 200 foot radius of the intake barge to the extent that the 200 foot radius covers only District property."

Thus, the District established that its 200-foot regulation has not substantially interfered with the Cumminses' use and enjoyment of their land, whether considering Lot 6 alone or the entire parcel. Because no direct, immediate, or substantial impact has occurred, the 200-foot regulation does not constitute either a *per se* or a case-specific taking and, as such, we do not reach the "economic impact" prong of the inverse condemnation inquiry. *See Travis County Landfill Co.*, 73 S.W.3d at 241 (ultimate question is whether regulation substantially interferes with land).[15]

---

[14] The District expressed its intent in a letter to the trial judge, supplementing the hearing testimony, and included similar statements in its affidavit testimony, its appellate brief and at oral argument.

[15] However, the District additionally established that, even if the 200-foot regulation economically impacted the Cumminses' land, they would not be entitled to compensation because the regulation was validly enacted pursuant to the State's police powers. *See* Tex. Const. art. XVI, § 59; *see also Barshop v. Medina Underground Water Conservation Dist.*, 925 S.W.2d 618, 623 (Tex. 1996) ("[c]onservation of water has always been a paramount concern in Texas"); *In re Adjudication of Water Rights of Upper Guadalupe Segment,* 642 S.W.2d 438, 445 (Tex. 1982) (State has constitutional duty to conserve water as a precious resource). The legislature has established water control and improvement districts to act as agents of the State in protecting its trust property and has invested them with broad authority to carry out this duty. *See* Tex. Water Code Ann. §§ 49.211(a), 51.121, 51.122, 51.127 (West 2000 & Supp. 2004-05); 30 Tex. Admin. Code § 290.41(e)(2) (2004).

### *The warning-signs requirement*

The Cumminses also claim that they have suffered a *per se* taking because the regulation's requirement that warning signs be placed along the shoreline constitutes a "physical invasion" of their property. The record shows that the District ordered signs, but nothing in the record evidences whether these signs were actually completed and placed on the Cumminses' land or that they have interfered with the Cumminses' use of their land. The Cumminses claim that the signs were placed on their property or, alternatively, that a genuine issue of material fact exists because the record does not evidence whether the signs were placed on their property. The District claimed that the signs were put up in April 1997, but that they were only placed on the District's land and were never placed on the Cumminses' property, in compliance with the requirement that the signs "be posted along the shoreline." This dispute, however, does not rise to the level of a genuine issue of material fact because, even if the District placed signs on the shoreline boundary of the Cumminses' land, the Cumminses have not demonstrated that this would constitute a *permanent* occupation of their land sufficient to entitle them to compensation. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435-36 (1982) ("direct physical attachment of plates, boxes,

---

Because the purpose of the 200-foot regulation is to ensure an adequate supply of safe drinking water to the public, it is substantially related to protecting the health, safety, or general welfare of the people. *See Turtle Rock Corp.*, 680 S.W.2d at 804. Also, the regulation is "reasonable" because it affects all users of Lake Travis equally and it encompasses only a small area; it is not being enforced against the Cumminses any differently than it would be against any other person who attempted to circumvent the regulation's prohibition of activity not related to the intake-barge within 200 feet. *See id.* Moreover, as members of the general public, the Cumminses benefit from this regulation. Therefore, despite any impact the 200-foot regulation may have had on the Cumminses' land, they are not entitled to compensation. *See Estate of Scott v. Victoria County*, 778 S.W.2d 585, 590 (Tex. App.—Corpus Christi 1989, no writ).

36

wires, bolts, and screws to the building, completely occupying space immediately above and upon the roof and along the building's exterior wall" constituted permanent occupation and, hence, was a taking).

Because the District conclusively established that its 200-foot regulation constitutes neither a *per se* taking nor a case-specific taking of the Cumminses' land, and negated that any genuine issue of material fact remains as to whether the warning-signs requirement constitutes a sufficient physical invasion of the Cumminses' land to be a *per se* taking, the Cumminses' first issue is overruled.

**Validity of 1000-Foot Regulation**

In their third issue, the Cumminses challenge the validity of the District's 1000-foot regulation, specifically asserting that it is an unauthorized expansion of the authority granted by the Commission's substantive rule, administrative code section 290.41(e)(2). *See* 30 Tex. Admin. Code § 290.41 (e)(2); Reg. 6.5.3.2. Agencies are not permitted to "impose additional burdens, conditions, or restrictions in excess of the statutory provisions" that authorized the rule. *Texas Alcoholic Beverage Comm'n v. Sanchez*, 96 S.W.3d 483, 487 (Tex. App.—Austin 2002, no pet.).

The rule established by the Commission states that "[r]aw water intakes shall not be located within 1,000 feet of boat launching ramps, marinas, docks, or floating fishing piers which are accessible by the public," and the District's regulation provides that "all recreational boating activity within 1000 feet is prohibited." 30 Tex. Admin. Code § 290.41(e)(2); Reg. 6.5.3.2. The phrase "all recreational boating activity" is simply a shorthand used by the District in place of the enumerated list of recreational boating activities appearing in the Commission's rule.

Even if the phrase "all recreational boating activity" was interpreted as broader than "all ramps, marinas, docks, and piers 'accessible by the public,'" this would not invalidate the District's rule because the legislature has granted the District the authority to accomplish its statutorily defined purposes by "any practical means." Tex. Water Code Ann. § 51.121. This authority expressly includes a water district's right to "adopt and enforce reasonable regulations" for the purposes of "preserv[ing] the sanitary condition of all water controlled by the district" and "regulat[ing] privileges on any land . . . controlled by the district." *Id*. § 51.122 (West Supp. 2004-05).

Based on the plain meaning of these statutes, the District established as a matter of law that its regulation imposed no burdens, conditions, or restrictions in excess of those statutorily authorized. The Cumminses' third issue is overruled.

**CONCLUSION**

The District established that it is entitled to summary judgment and that no genuine issue of material fact remains on any of the Cumminses' claims by conclusively proving that (1) the Cumminses are not littoral owners because their chain of title was not granted prior to 1895 and it did not convey land appurtenant to a natural lake with a normal flow of water; (2) even if the Cumminses were littoral owners, that would not entitle them to construct a boat dock over waters and submerged lands that are owned by the State, as trustee for the public, and regulated by the District for the purpose of ensuring an adequate supply of safe drinking water for the public; (3) the Cumminses' chain of title did not convey an express easement to use the water and the Cumminses have not made apparent, continuous, and necessary use of the water to support an implied easement;

38

(4) the District's 200-foot regulation does not result in a compensable taking of the Cumminses' property—whether considering the entire parcel or just Lot 6—because it is a legitimate exercise of the State's police power that has not substantially interfered with the Cumminses' use and enjoyment of their land; (5) the District's warning-sign regulation does not constitute an inverse condemnation of the Cumminses' land because it has not resulted in a permanent, physical occupation of the land; and (6) the District's 1000-foot regulation is valid because it does not exceed the authority expressly granted to the District by statute.

Because the District conclusively demonstrated its entitlement to judgment as a matter of law, and no genuine issues of material fact remain, we affirm the summary judgment.

_____

Jan P. Patterson, Justice

Before Justices Kidd, Patterson and Puryear;
    Justice Kidd Not Participating

Affirmed

Filed:   June 3, 2005

39